IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TIZE W. CLARK, *author*, and
BAU PUBLISHING GROUP,

      Plaintiffs,

vs.                                                                   Civ. No. 14-00965 KG-KK

JAMES DASHNER, RANDOM
HOUSE LLC, TWENTIETH CENTURY
FOX, T.S. NOWLIN, NOAH OPPENHEIM,
and GRANT PIERCE MYERS,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Defendants' Motion to Dismiss Complaint

(DKT. #1) by Defendants Dashner and Random House (Incorporating Authorities) (collectively,

Motion to Dismiss), filed January 20, 2015.  (Doc. 22).  Plaintiffs filed a response on February

20, 2015, and Defendants replied on March 13, 2015.  (Docs. 36 and 44).  Having reviewed

Defendants' Motion to Dismiss, the accompanying briefs, and the Complaint (Doc. 1), the Court

grants Defendants' Motion to Dismiss.

*I.   The Complaint (Doc. 1)[1]*

On October 24, 2014, Plaintiffs initiated this action against Defendants, alleging

infringement on Plaintiff Tize W. Clark's (Plaintiff Clark) copyright of *The Maze*, a novel.  In

2002, Plaintiff Clark obtained a copyright in his 2002 manuscript titled, *The Maze*, Registration

---

[1]  For purposes of resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pled facts as true.  Accordingly, the Court has relied upon Plaintiffs' Complaint in outlining the facts pertinent to this motion.  The Court, however, need not accept Plaintiffs' legal conclusions and conclusory statements in paragraphs 18, 19, 20, and 21 of the Complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Number TXu 1-069-309 (*The Maze*).  (Doc. 1) at ¶¶ 12–13; *see also* (Doc. 22-1) at 2–3.[2]
Plaintiffs allege that the concept of *The Maze*—including the idea of a giant maze with moving
walls and robotic creatures—is Plaintiff Clark's original work.  *Id.* at ¶ 16.  In 2004, Plaintiff
Clark published an original version of *The Maze*; and in June 2005, Plaintiff Bau Publishing
Group published *The Maze* with the International Standard Book Number (ISBN) 0-9766770-0-
8.  *Id.* at ¶¶ 14, 25.  Also in June 2005, Plaintiff entered into a book distribution and sale
agreement with Barnes & Noble, Inc. and various other booksellers.  *Id.* at ¶ 15.

In 2006, Defendant James Dashner (Defendant Dashner) started writing *The Maze
Runner*.  *Id.* at ¶ 17.  In 2009, Defendant Dashner copyrighted *The Maze Runner*.  *Id.*  That same
year, Defendant Random House, L.L.C. (Defendant Random House) published *The Maze
Runner*.  *Id.*

In Count I, Plaintiffs state a copyright infringement claim pursuant to 17 U.S.C. §§ 101–
1332 against Defendants Dashner and Random House.  *Id.* at ¶¶ 22–35.  Plaintiffs claim
Defendants infringed on the protectable copyright expressions within chapter two and chapters
eight through fourteen of *The Maze*.  *Id.* at ¶ 26.  More particularly, Defendants allegedly
infringed on Plaintiffs' original copyrighted work of "giant movable walls, robotic half human
half machine terrifying creatures chasing teenage boys trying to escape from the death trap
environment that is constantly changing shape."  *Id.* at ¶ 23.

In Count II, Plaintiffs seek injunctive relief for the alleged copyright infringement.  *Id.* at
¶¶ 36–42.  In Count III, Plaintiffs bring a claim for unfair trade practices and unfair competition
based on Defendants' publication, selling, and marketing of *The Maze Runner* without credit or
royalties to Plaintiff Clark.  *Id.* at ¶¶ 43–47.  Finally, in Count IV, Plaintiffs allege a copyright

---

[2]  Paragraphs twelve and thirteen of Plaintiffs' Complaint are identical.

infringement claim pursuant to 17 U.S.C. §§ 101–1332 against Defendant Twentieth Century Fox for the screenplay of *The Maze Runner*.  *Id.* at ¶¶ 48–56.

Defendants now move to dismiss Counts I–III under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted.  Of course, Plaintiffs oppose Defendants' Motion to Dismiss in its entirety.

*II.  Legal Standard*

In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and must view them in the light most favorable to the plaintiff.  *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).  Rule 12(b)(6) requires that a complaint set forth the grounds of a plaintiff's entitlement to relief through more than labels, conclusions and a formulaic recitation of the elements of a cause of action.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts sufficient to state a plausible claim of relief.[3]  *Id*. at 570.  A claim is facially plausible if the plaintiff pleads facts sufficient for the Court to reasonably infer that the defendant is liable for the alleged misconduct.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Granting a Rule 12(b)(6), however, "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quotation omitted).

---

[3]  Notably, Plaintiffs contend the proper standard for a Rule 12(b)(6) motion is that the motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  (Doc. 36) at 2 (citing *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  In light of *Twombly* and its progeny, the Court will not entertain Plaintiffs' proffered legal standard.

In evaluating a Rule 12(b)(6) motion, courts may also consider any attached exhibits, documents incorporated by reference, and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal quotations and citations omitted).  And, "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Assocd. Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir. 1997).

*III. Discussion*

Defendants contend Plaintiffs' copyright infringement claim (Count I) is subject to dismissal because a review of the parties' works demonstrates insufficient similarity of protectable expressions, and therefor, Plaintiffs' injunctive relief demand (Count II) also must be dismissed.  Defendants further contend Plaintiffs' state law unfair trade practices and unfair competition claims (Count III) are preempted by federal copyright law.  Defendants also contend that *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23 (2003), bars Plaintiffs' federal unfair competition claim (Count III).  Each contention will be discussed in turn.

   A.  *Comparison of the 2002 Manuscript of* <u>The Maze</u> *(Docs. 22-1 and 22-2) and the 2009 Publication of* <u>The Maze Runner</u> *(Ex. 2)*

Plaintiffs argue preliminarily that in evaluating a Rule 12(b)(6) motion, the Court may not review and compare the copyrighted and infringed work.  Plaintiffs' assertion is contrary to well-established case law.  First, the Court may consider any documents incorporated by reference, and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith*, 561 F.3d at 1098.  Here, Plaintiffs attached excerpts of the two books to the Complaint. *See* (Doc. 1-1);

4

(Doc. 6).  Indeed, the Complaint references both works, which are paramount to Plaintiffs'
copyright infringement claim.  Moreover, Plaintiffs do not dispute the authenticity of the 2002
manuscript, *The Maze* (Docs. 22-1 and 22-2), nor the 2009 publication of *The Maze Runner* (Ex.
2).[4]

Second, there is a dearth of jurisprudence in the context of a motion to dismiss where
courts have examined the copyrighted and infringed work to determine whether the works are
substantially similar.  *See Effie Film, LLC v. Murphy*, 564 Fed. Appx. 631 (2d Cir. 2014); *Wild v.
NBC Universal*, 513 Fed. Appx. 640 (9th Cir. 2013) (citing *Christianson v. West Pub. Co.*, 149
F.2d 202 (9th Cir. 1945)); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002);
*Tanikumi v. Walt Disney Co.*, 2015 WL 716429 (D.N.J. Feb. 19, 2015); *Boston Copyright
Assocs., Lts. v. U-Haul Int'l, Inc.*, 2015 WL 666952 (D. Mass. Feb. 17, 2015) (citing *Winstead v.
Jackson*, 509 Fed. Appx. 139 (3d Cir. 2013) ("[W]here the works in question have been
submitted by the parties and are authentic, it is proper for the District Court to consider the
similarity between those works in connection with a motion to dismiss."); *Peter F. Gaito
Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010); *Nelson v. PRN Prods., Inc.*,
873 F.2d 1141 (8th Cir. 1989)); *Acker v. King*, 46 F. Supp. 3d 168 (D. Conn. 2014); *Dean v.
Cameron*, 53 F. Supp. 3d 641 (S.D. N.Y. 2014);  *Harris v. Mattel Inc.*, 2013 WL 3154124 (E.D.
Okla. June 21, 2013).  In light of this precedent, the Court will review and compare the
copyrighted 2002 manuscript of *The Maze* and the 2009 publication of *The Maze Runner*.

---

[4]  Notably, Plaintiffs attached the alleged 2005 edition of *The Maze* to the response.  *See* (Doc. 36-1).  A review of
(Doc. 36-1) does not indicate whether the proffered document is the actual 2005 edition.  For instance, Plaintiffs did
not attach the front matter section of the book, which includes the book's title, the author's name, and the copyright
and publication information.  Despite this issue, the Court has carefully read and compared the 2002 manuscript and
the alleged 2005 edition.  The Court finds that any discrepancies between the two editions are inconsequential to the
disposition of the instant motion.  The Court, thus, relies upon the undisputed authenticated copyrighted 2002
manuscript for purposes of this motion.

B.  *Copyright Infringement (Count I)*

Defendants first contend that Plaintiffs' copyright infringement claim must fail because Plaintiffs erroneously seek protection of unprotectable elements in *The Maze*, including the "ideas and concepts" of mechanical/robotic creatures and a giant maze with moveable walls. Defendants further contend that Plaintiffs fail to state a claim for copyright infringement because Defendant Dashner's *The Maze Runner* is not substantially similar to Plaintiff Clark's *The Maze*. In support of their assertions, Defendants submit the 2002 manuscript of *The Maze* (Docs. 22-1 and 22-2) and the 2009 copyrighted text of *The Maze Runner* (Ex. 2).

A plaintiff must prove two elements to establish copyright infringement:  "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012) (internal quotation omitted).  In this matter, Defendants do not dispute the sufficiency of Plaintiffs' pleadings as to the first element. Hence, only the second element—copying—is at issue.

The copying element consists of two components.  *Id.* (internal citation omitted).  First, a plaintiff must show a defendant copied the plaintiff's work "as a factual matter."  *Id.*  (internal quotation omitted).  Second, a plaintiff must demonstrate a "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected." *Id.*  (internal quotation omitted).  This second component, "a question of law and fact, determines whether a defendant's factual copying constitutes actionable infringement."  *Id.* Defendants do not raise an issue with the first component, thus, only substantial similarity is at issue.

"To decide the substantial similarity issue, a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to

the accused work." *Savant Homes, Inc. c. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (citing *Blehm*, 702 F.3d at 1200).  A court may address either step first.  *Id.* (citing *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 833 (10th Cir. 1993)).

　　　　*(a) Protectable Elements*

　　　Section 102(a) of the Copyright Act protects "original works of authorship."  17 U.S.C. § 102(a).  "Originality exists where a 'work was independently created by the author (as opposed to copied from other works), and . . . it possesses at least some minimal degree of creativity.'" *Savant Homes, Inc.*, 809 F.3d at 1138−39 (citing *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 345 (1991)).  The requisite level of creativity is "extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  *Id.*  As a result, the originality requirement separates protectable elements from unprotectable elements of a copyrighted work.  *Id.*

　　　"In no case does copyright protection for an original work of authorship extend to any *idea* . . . [or] *concept* . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b) (emphasis added).  "This provision enshrines the 'fundamental tenet' that copyright 'protection extends only to the author's original expression and not to the ideas embodied in that expression.'"  *Blehm*, 702 F.3d at 1200 (quoting *Gates Rubber Co.*, 9 F.3d at 836).  Significant to this case, under the "*scenes a faire doctrine*," copyright protection is denied to those expressions of idea "that are standard, stock, or common to a particular topic, or that necessarily follow from a common theme or setting."  *Gates Rubber Co.*, 9 F.3d at 838.

　　　In this matter, viewing the alleged facts as true and in the light most favorable to

Plaintiffs, the Court finds Plaintiffs have not sufficiently pled factual allegations to state a claim

of relief for copyright infringement.  Plaintiffs allege the "concept" and "idea" of a giant maze

with moving walls and robotic creatures are original protectable "ideas."  *See* (Doc. 1) at ¶¶ 16,

19–20.  Plaintiffs, however, do not have a monopoly on the idea of individuals and/or teenagers

attempting to escape a giant maze, but are consistently thwarted by formidable elements.  Indeed

the theme of a complex and dangerous "maze" exists in Greek mythology.[5]  And the concept has

been revitalized in recent decades.  *See, e.g.*, J.K. ROWLING, HARRY POTTER AND THE GOBLET OF

FIRE (Scholastic 2000) (a maze tournament); UMBERTO ECO, NAME OF THE ROSE (Harcourt

1983) (murder mystery involving a labyrinth); URSULA K. LE GUIN, TOMBS OF ATUAN (London

Gollancz 1972) ("coming of age" female navigates a dark labyrinth).  Put simply, Plaintiffs

cannot copyright the idea of a maze wherein occupants are challenged, tormented, and killed—

environments often central to the protagonist's perseverance in science fiction, dystopian, and

horror genres.

      Nor may Plaintiffs copyright the concept or idea of biomechanical creatures—imagery

and characters also prevalent in the science fiction, dystopian, and horror genres.  *See* SCOTT

WESTERFELD, LEVIATHAN (THE LEVIATHAN TRILOGY) (Simon Pulse 2010) (airships made from

bioengineered creatures); SUZANNE COLLINS, HUNGER GAMES BOOK ONE (Scholastic Press

2009) (mutated mutts with metallic plates); PHILIP K. DICK, DO ANDROIDS DREAM OF ELECTRIC

SHEEP? (Del Rey 1996) (bounty hunter tracks fugitive androids).[6]

      Accordingly, the elements of a dangerous maze and robotic creatures are unprotectable

---

[5] *See* LABYRINTH, www.ancient.eu/Labyrinth (last visited June 14, 2016).

[6] *See also* ARTIFICIAL INTELLIGENCE —A TREND IN YOUNG ADULT SCIENCE FICTION,
www.goodreads.com/list/show/22515.Artificial_Intelligence_A_Trend_In_Young_Adult_Science_Fiction (last
visited June 14, 2016) (listing thirty-seven novels that incorporate "human-like cyborgs, androids, partial humans,
engineered human-tissue slaves, robots, and humanoid life-forms").

*scenes a faire*, as these elements often recur in science fiction, dystopian, and horror genres.  The Court, therefore, finds the Complaint lacks any allegations, beyond Plaintiffs' conclusory statement, that Defendants infringed on Plaintiffs' protectable expressions of a giant maze and robotic creatures.  Thus, Plaintiffs' Count I is subject to dismissal with prejudice under Rule 12(b)(6).  *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

(b) *Substantial Similarity*

Assuming *arguendo* that Plaintiffs' ideas and concepts are protectable, the Court finds that Plaintiffs' allegation of "substantial similarity" cannot be supported.

"Once a court has distinguished between unprotected ideas and protected expression in a copyrighted work, it must determine whether the protected elements are substantially similar to the accused work."  *Blehm*, 702 F.3d at 1202.  The issue of substantial similarity is, ordinarily, a question of fact.  *Jacobsen*, 287 F.3d at 943.  When both the infringing work and copyrighted work are before the Court on a motion to dismiss, however, "the Court may consider the works themselves and determine as a matter of law whether the allegation of substantial similarity can be supported."  *Harris*, 2013 WL 3154124, at *3 (citing *Peter F. Gaito Architecture, LLC*, 602 F.3d at 63–64; *Jacobsen*, 287 F.3d at 941.  "Substantial similarity exists when the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value."  *Savant Homes, Inc.*, 809 F.3d at 1140.  Furthermore, when assessing substantial similarity between literary works, courts consider a variable list of characteristics, including "plot, theme, dialogue, mood, setting, pace, characters, and sequence of events."  *Shaw*

*v. Lindheim*, 919 F.2d 1353, 1359 (9th Cir. 1990).

In accordance with the foregoing standard, the Court endeavors to compare *The Maze* and *The Maze Runner*—in their entirety—in order to determine whether the allegation of substantial similarity within the Complaint can be supported.  *See Jacobsen*, 287 F.3d at 945–46 (comparing two literary works); *Harris*, 2013 WL 3154124, at *3 (comparing cover art).

> (i)  *The Maze (Docs. 22-1 and 22-2)*

*The Maze* begins with a prologue set on May 24, 1939, where Monroe Anton Xavier, also known as "Max," travels with his older brother Chris, and their parents from the Bronx to Coney Island Amusement Park in Brooklyn, New York.  After the family arrives at the amusement park, Max reluctantly follows Chris into the Hall of Mirrors.  Upon entering the Hall of Mirrors, Chris abandons Max and taunts him throughout the maze.  Max becomes fearful and Chris attempts to help Max through the maze, but once again leaves Max behind by running through an exit door.  Chris, however, accidentally leaps "legs first" through a mirrored reflection of the exit door.  Max stands in horror as Chris' spine is severed by a piece of glass and, shortly thereafter, a section of the mirror falls and decapitates Chris.  Due to the traumatic event, Max becomes the "stone-hearted" head of a multi-billion dollar international conglomerate.

The remaining chapters are set in present day New Mexico and New York.  *The Maze* focuses on the story of Jay, Ramon, and Rob—three nineteen-year old males from Truchas, New Mexico.  Jay is a short, tentative, acne prone individual who is often bullied by Ramon and Rob. Rob is athletic, vain, and cocky.  Ramon is hot-headed and extremely poor.  The three men see a television advertisement promoting a multi-billion dollar bequest from Max to anyone who can make it through his maze.  Confident that they can succeed because they grew up navigating the mountainous maze-like terrain of Truchas, they enter the contest.  The catch, the three men must

10

travel to New York in order to participate in Max's maze.  The men prepare for their impending travel and celebrate their potential fortune at the Torching of Zazobra in Santa Fe, New Mexico.  During the event, Rob and Ramon ditch Jay.  Feeling despondent, Jay throws a wish into the burning Zazobra ashes.  Subsequently, Zazobra's head falls at Jay's feet, smiles, and spits out a burnt piece of paper at Jay.  Jay grabs the piece of paper and quickly runs away into the night.

The following day, the three men embark on their trip to New York.  The boys travel to the airport by limousine.  During the ride, Rob has a very vivid nightmare about a boy with "razor sharp broken teeth" breaking and biting his arm off.  When the men land in New York, they realize they need further instructions to travel from the airport to the maze.  Waiting outside the airport for instructions, a man approaches the three men and retrieves a wallet from the front zipper of his pants.  He throws the wallet at Ramon.  When they open the wallet, the men discover a note directing them to an underground train station for the "D" train.

When the men finally arrive at the "D" train platform, they must once again await further instructions.  After the train arrives, a tremendously obese man approaches Rob.  The man begins to reach into his pocket when dozens of cockroaches start scattering from the man's pocket, up his arm, and onto his face.  Releasing a hideous laugh similar to the boy from Rob's nightmare, the man places a note covered in maggots and roaches in front of Rob.  Ramon, in Rob's defense, strikes the man with a stick, causing millions of maggots to fall from the man's clothes.  Suddenly, the man leaps in front of an oncoming train.  Upon impact, the man's body implodes releasing "hundreds of rats and bugs drenched in blood."  After the ensuing pandemonium, Rob notices the final instructions to the maze.

The final note directs the three men to enter the train tunnel, "take thirteen large steps," turn right, and follow a "fifteen-foot hallway" to a large black door.  After debating whether to

withdraw from the maze, the men follow the directions.  They arrive at the door and Rob opens

the door and "thousands of rats pour out" into the hallway.  The men attempt to escape the rats

by retreating to the tunnel; however, the hallway is now mysteriously enclosed.  The room fills

quickly with rats and the men panic.  Abruptly, a wall rises exposing a hidden room.  As the wall

rises a strong gust of wind blows the rats in the opposite direction.  Once free of the rats, "the

platform" below the men ascends rapidly.  Realizing the platform may collide with the ceiling,

the men lie on their backs and place their feet on the ceiling to stop the impending collision.

Finally, the ceiling splits in two like a bridge.  A welcoming committee cheers, "Welcome to the

Maze!" and the men notice they are in an office.

　　　　Three of Max's employees give the men a tour of the business complex.  After the men

eat, a hostess directs Jay, Rob, and Ramon into a dark room where five other individuals are

sitting.  Jay, Rob, and Ramon learn that the five individuals are also maze contestants.  Ramon,

shortly thereafter, gets into an altercation with tall, bald headed, "dark brown skin" contestant,

Kevin Johnston.  A hostess informs the contestants that fighting before the maze will result in

immediate disqualification; and the disqualified contestant will be "injected with a chemical that

will cause" the contestant to "forget [his/her] trip to the maze."  The hostess then verifies that the

contestants are of legal age and introduces the remaining contestants:  a "young lady" named

Kenya Harris; a "young lady" named Kisha Grant and her dog Mr. Shakes; Sean Levan; and

Ricky Harris, Kenya's younger brother.  After introductions, the contestants are required to sign

contracts stating that M.A.X. Enterprises is not responsible for any injuries, death, or accidental

death within the maze.

　　　　The hostess informs the eight contestants that they may enter the maze through the door

on the opposite side of the wall.  All the contestants enter the first room of the maze, which is

empty.  The contestants discover another door, which leads to another empty room.  After walking through three empty rooms, the contestants enter a room of mirrors that smells like "the sweet aroma of candy flavored popcorn," and notice a sign stating hall of mirrors "in an old amusement park lettering style."  Unable to find an exit, the contestants attempt to backtrack to the prior room.  The door, however, slams shut and is covered by a mirrored wall.  Frustrated, Kevin and Ramon get into an altercation.  Kevin throws Ramon through several mirrored walls revealing a hidden room that smells like rotten corpses.

The new room is a dark and steamy stairwell with steel gated floors.  And the railings are covered in strips of human flesh and blood.  Kisha ends up separating from the group.  The group attempts to follow Kisha, but the walls shift and isolate Kisha from the group.  The group continues their journey down the stairs, into a corridor, and up another stair case.  The staircase leads the group to a beautiful full size flower garden that resembles the "Botanical Garden in the Bronx."  Quickly, the room divulges its true function as a graveyard for the prior contestants and eight new burial plots.  Frightened, they flee the graveyard through an opening in a gate.  As the contestants walk through the maze the walls raise and switch from left to right exposing a variety of walls:  brick walls, solid steel beams, wallpapered walls, and walls covered in picture frames.

Soon, the contestants come upon another flight of stairs covered in powder pink carpeting and emitting a baby powder odor.  While the contestants climb the stairs, Sean notices a ray of light coming through a door in the opposite direction of the stairs.  Thinking it is an exit, Sean runs through the door.  The door slams shut and is replaced by a wall of steel beams.  The silence is filled by Sean's "[t]errifying screams" and the "loud snapping" of his bones.  Once Sean's screams subside, a rumbling noise starts and Sean's remains are tossed over the wall and onto Jay.

Kisha, still separated from the group, also enters a room that smells like baby powder and is covered in powder pink carpeting.  Kisha discovers an abandoned baby in the room and immediately consoles the baby and attempts to breastfeed the baby.  After Kisha is unable to produce milk, the baby screams profanities and its mouth mutates into "huge oversized teeth" that protrude like "fangs."  The baby mauls Kisha's chest and, eventually, eats her whole.

The remaining six contestants, hearing Kisha's screams, stay huddled close together.  The maze, nonetheless, transforms again placing the contestants in a bright room where they are showered with blood.  In a panic, the contestants run up a flight of stairs, which begin to rise like it is "elevating them to a new level."  The staircase abruptly ceases and a door is revealed at the bottom.  The new room displays brick walls with large metal linked dog chains.  After hearing dogs growl and bark, the group quickly ascends the stairs once again.  The maze, however, shifts and a wall opens revealing massive pit bulls.  As the group frantically runs up the staircase, Kenya is pushed over the edge of the maze where she lands on a transparent platform.  The group carefully descends to the platform to assist Kenya.  Despite their assistance, Kenya refuses to move.  Kevin attempts to jump over her and falls straight down landing feet first into the motor of the maze.

After they watch Kevin die, the five constants follow the transparent floor to an open door.  Once in the new room, Jay and Rob notice Ricky disappeared.  Kenya explains that her brother is a womanizer and selfish.  The four of them decide to continue without Ricky.  As they start walking through the maze, the walls continue to shift.  Eventually, another wall shifts revealing a staircase to a lower level.  When they start to descend they notice the cannibal baby at the bottom of the stairs and run in the opposite direction.  The staircase, surprisingly, rotates, flips, and places the contestants in another room.

This new room displays beautiful art, including Michelangelo's David and the ceiling of the Sistine Chapel. The room also includes a two way mirror into another room. Kenya, Jay, Rob, and Ramon watch as Ricky enters the room and encounters a beautiful and frightened woman. After Ricky consoles the woman, she and Ricky engage in intercourse. The woman, however, is a robotic creature that pulverizes Ricky's entire body through her vagina and then throws up his remains. In shock from witnessing her brother's death, Kenya rushes out of the room before the entryway closes. Jay, Rob, and Ramon start to look for an exit when Michelangelo's David comes to life and attempts to urinate acid on them. The contestants flee the room through a hidden small square opening with a slide.

The maze continues to mentally torment the contestants as the walls shift prolonging their journey. Unexpectedly, the maze's walls collapse leaving the maze exposed. Kenya, noticing the three men, sprints across the giant hall as walls quickly rise behind her. Kenya attempts to dive to the men, when she is suddenly encased by four walls. After being tormented by the sounds of trains the room is flooded by large rats. Despite her attempts to fight the rodents, Kenya eventually is engulfed by a thousand rats and killed.

Jay, Rob, and Ramon, safe from danger, find three large black steel doors. Ramon approaches the left door; when he touches the handle a strong gust of wind blows through the maze tousling his hair. Ramon opens the door and massive pit bulls leap out at him and surround him. At that same time, Rob opens the right door and rats flood the area. The pit bulls, distracted by the rats, abandon their post over Ramon. Rob hastily opens the middle door to discover day light. Rob and Ramon sprint through the middle door and are immediately decapitated by a huge razor sharp steel rod. Jay, on the other hand, runs through the doorway and is unharmed. Tormented by the events of the maze, Jay exits the maze as the winner and as

a "mad man, like Max."  The novel concludes with the narrator revealing that Zazobra granted Jay's wish.

### (ii) The Maze Runner (Ex. 2)

*The Maze Runner* novel begins with a boy named, Thomas, waking up in an upwardly moving metal box with no memory of who he is except for his name.  When the metal box stops, the doors open overhead revealing a community of fifty to sixty boys ranging from teenagers to young adults.  The boys, also known as "Gladers," live on a farm-like setting called, "the Glade," which is encased by large concrete walls covered in ivy.  And, like Thomas, the boys have no recollection of their lives before entering the Glade.  Thomas quickly learns that every month supplies and a boy are delivered to the Glade via the metal box.  Thomas also discovers that the four walls surrounding the Glade are over a hundred feet tall and each wall has a sliding door in its center that opens every morning and closes every night.

Shortly after arriving to the Glade, Thomas meets the leader, Alby, and his second in command, Newt.  Thomas also befriends a young boy named Chuck.  The Gladers inform Thomas about the different roles around the Glade, including "Runners."  Runners, led by Minho, run the maze during the day in an attempt to map the maze and find a way out of the maze.  Runners must exit the maze before the maze doors close because "Grievers"—large bulbous dark creatures—sting Runners remaining in the maze.  If a Runner is stung, he must return to the Glade in time to be injected with a lifesaving serum; but the serum causes a strange painful process.  The Gladers call it the "Changing"—when part of the victim's memory returns.

The next day, for the first time ever, a girl arrives at the Glade.  Although she has no recollection of who she is except for her name, Teresa, she informs the Gladers that everything is

about to change.  Teresa then becomes comatose.  The boys learn that she will be the last person sent to the Glade.

Shortly thereafter, Thomas is attacked by a boy named Ben, who is going through the Changing.  Ben claims that he remembers Thomas and knows who he really is.

During this time, Thomas becomes fascinated with the maze and decides that he would like to be a Runner.  One morning, Alby and Minho leave to run the maze.  Unfortunately, Alby is stung by a Griever.  Minho attempts to bring Alby back to the Glade before the doors close. Thomas, watching the doors, notices that they are not going to make it back in time.  Thomas enters the maze to assist Alby and Minho.  All three become trapped within the maze.  That night Minho flees when the Grievers arrive; Thomas, however, out maneuvers the Grievers and saves Alby's life and his own.  The next morning, Thomas, Alby, and Minho, exit the maze as the first Gladers to survive a night in the maze.  Some Gladers, specifically one named Gally, accuse Thomas of being a spy for the Creators—the individuals who created the maze and entrapped the Gladers.  Minho and Gally get into an altercation and Gally runs away swearing revenge.

Because of his skills in the maze, Thomas becomes a Runner trainee.  When he begins his training, he learns that the walls within the maze move only at night.  It is the Runners' job to look for patterns within the maze.  One day on a run in the maze, Thomas discovers a plaque that carries the words, "World In Catastrophe:  Killzone Experiment Department" (WICKED).  None of the Gladers know what the plaque means.  Thomas and Minho also watch a Griever run off the cliff of the maze and disappear into an invisible hole, which they aptly name "the Griever Hole."

At this time, Alby is still recovering from the Changing.  Due to the Changing, Alby recovers some of his memories, and believes that Thomas and Teresa are involved with the

maze.  Thomas also visits Teresa, who is still comatose, but communicates telepathically with Thomas.  Teresa reveals to Thomas that the two of them were involved in the implementation of the maze.  She also informs him that the maze is a code.

The next day, the sun is replaced by a slate gray, flat sky and a weak artificial light. Thomas realizes that the Glade is possibly an artificial illusion.  That night, the doors to the maze do not close allowing the Grievers to enter the Glade.  The Gladers retreat to the Homestead, a large house in the Glade, and wait for the Grievers to enter the Glade.  Thomas, Minho, Newt, and Alby meet at the Homestead and discuss how to proceed now that the maze is modifying. Alby, still recovering from the Changing, removes himself from the decision-making process and volunteers to handle the Runners' maps.  Gally reappears and informs everyone in the Homestead that the Grievers will kill one person a night until they are all dead.  Gally throws himself onto a Griever, which retreats into the maze.  Minho follows the Griever and reports back that the Griever jumped off the cliff and into the Griever Hole.  It is also discovered that someone broke into the map room and burned all of the maps.  Fortunately, the burned maps are decoys.

Newt and Minho show Thomas and Teresa the real maps.  The four of them work diligently to decipher the code within the maps.  Thomas quickly realizes that a day's section of the maps forms a layered image.  In particular, the letter "F" is revealed when a section of the maps are stacked together.  Swiftly, they discover a set of words.  Over the next day, Teresa solves the code, generating the words:  float, catch, bleed, death, stiff, and push.  The words, nevertheless, have no meaning to the Gladers.  Frustrated, Thomas stalks a Griever with the intent to be stung and revive his memories.

After Thomas recovers from the Changing, he explains that he and Teresa were forced to help the Creators design the maze. Thomas also informs the group that the way out of the maze is over the cliff and down the Griever Hole. Then, if they make it through the hole they must punch in the code words into a computer to be released from the maze.

Shortly thereafter, Thomas leads a group of Gladers into the Maze. There, the group fights an army of Greivers and approximately half of the Gladers die. Thomas, Teresa, and Chuck, on the other hand, escape down the Griever Hole. They land in a dark stone cylinder. Teresa successfully enters five of the passwords—float, catch, bleed, death, and stiff—into the computer. All the while, Grievers start to attack. Teresa attempts to enter the final password, "push," but the computer rejects the password. Chuck, notices a small red button on the wall near the floor with the words "Kill the Maze" above it. Teresa "pushes" the button and the Grievers immediately shut down and a tunnel appears. The surviving boys join Chuck, Thomas, and Teresa and follow them to the tunnel and down a spiraling oily chute that dumps them in a massive underground bunker.

In the bunker, the Gladers come face to face with the Creators: thin, pale, joyless adults who take copious notes while observing the Gladers behind plexiglass. Eventually, a woman from WICKED and a boy approach the Gladers and congratulate them on their accomplishment. The boy reveals himself as Gally and declares he is being controlled. Then, he retrieves a knife and throws it at Thomas. Chuck sacrifices himself by diving in front of the knife, saving Thomas. Enraged, Thomas attacks Gally and nearly beats him to death.

After Thomas calms down, a group of rescuers storm the room and execute the WICKED woman. The rescuers escort the Gladers outside and into a large bus. While on the bus, the Gladers are told of a world torn apart by the arrival of atypical solar flares. The solar flares

19

killed millions, destroyed the ecosystem, and produced an illness called, "the Flare." The Flare causes mental breakdowns and treatments are reserved for the wealthy. The rebels further explain that the maze was an experiment to find individuals who were capable of stopping the Flare.

The book concludes with the Gladers arriving at a dormitory like building, filled with bunk beds, blankets, bathrooms, and food. For the first time the Gladers feel safe.

### (iii)   Substantial Similarity Analysis

Based upon the comparison of *The Maze* and *The Maze Runner*, the Court finds that no reasonable person could conclude that the two works are substantially similar beyond the level of generalized or otherwise unprotectable ideas. Although the works do share some similarities— *i.e.*, a giant maze, shifting walls, and robotic creatures—the manner in which the authors *express* those ideas varies tremendously.

### (1)   Plot/Sequence of Events

Plaintiffs provide a list of eleven major events that they claim appear in both works in substantially the same sequence. The similarities between the two plots are either too general or concern unoriginal components, which do not enjoy copyright protection.

Plaintiffs first allege that both works contain giant mazes with shifting walls. The authors' expressions of the shifting walls—how or why the maze was created, when the walls shift, and the composition of the walls—contain no factual similarities. In *The Maze*, Max, a madman, created the maze with actively shifting walls and staircases to terrorize the contestants. Each shift placed the contestants in another treacherous and freighting scenario; and typically resulted in the death of a contestant. Additionally, the composition of the walls randomly changes from brick, to steel, to wallpaper, and walls covered in picture frames and art.

20

Conversely, in *The Maze Runner*, WICKED created the maze as an experiment to test the

Gladers and find a cure for the Flare.  The maze is constructed of tall stones covered in ivy.

More importantly, every night the walls shift creating a new pattern that is repeated monthly.

The Gladers determine that the patterns reveal six code words that will assist in their escape from

the maze.  Thus, the context of the shifting of the walls is markedly different and cannot support

a finding of substantial similarity.

    Plaintiffs further assert that the protagonists' entrances into the mazes are substantially

similar.  In a limited context, this assertion bears some weight because the protagonists enter the

maze via a mechanical lift.  Nevertheless, there are no factual similarities as to how the

protagonists arrive at the lift.  In *The Maze*, the protagonists' journey to the lift includes

extensive travel and overcoming hurdles like—traveling to another state, waiting for instructions,

being tormented by a tremendously obese man who eventually explodes into hundreds of bloody

rats and bugs, walking through a smelly tunnel, and being attacked by rats before arriving at the

lift.  In contrast, in *The Maze Runner*, the story opens with the protagonist in a lift and no

memory of how he arrived.  Nor do the Gladers arrive as group.  Rather, a single boy is delivered

to the Glade on a monthly basis.  Additionally, the concept or idea of an ascending underground

platform is not novel in the realm of fiction.

    Next, the factual similarities between the botanical garden in *The Maze* and the Glade in

*The Maze Runner* are not substantial.  In *The Maze*, the contestants discover a beautiful botanical

garden with a fish pond.  Shortly after entering the room, they observe that the room is a

graveyard for past contestants; and it contains burial plots for each new contestant.  Frightened,

the contestants exit the room through a gate.  In *The Maze Runner*, the Glade serves as the living

space for the Gladers and is separated into four sections:  the gardens where crops are grown and

water is pumped; the Homestead where the Gladers sleep; the blood house where the livestock are raised and slaughtered; and a graveyard. The Glade is encased by four large walls that separate it from the maze—it is not part of the maze. The Court finds that no reasonable person would determine that the botanical gardens and Glade are substantially similar.

Plaintiffs further claim the plots are similar because they contain mechanical creatures that kill teenagers. In *The Maze*, the maze is designed to play on the contestants' fears and character traits. For example, Kisha is mauled and eaten by the baby she cannot have because she's infertile, while Ricky, the womanizer, is killed by a beautiful mechanical woman. The maze also incorporates small dog size rats, statues that come to life, and massive pit bulls with their insides turned out. The only "mechanical" being is the woman who killed Ricky. Conversely, the Grievers in *The Maze Runner* are the only mechanical creatures that attempt to kill the Gladers. The Grievers—other than being biomechanical—bear no resemblance to the mechanical woman, the cannibal baby, large rats, or the massive pit bulls described in *The Maze*. Moreover, mechanical creatures in the science fiction, dystopian, and horror genres amounts no more than a *scene a faire* in those genres. Consequently, the Court finds no reasonable person would find the creatures of the literary works to be substantially similar.

The remaining plot similarities identified by Plaintiffs are alleged at an abstract level of generality. Specifically, Plaintiffs allege that scenes with narrow escapes, chasing scenes, and scenes involving suspense and survival are substantially similar. "It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots." *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D. N.Y. 1990). Basic plot *ideas* involving suspense, horror, murder, narrow escapes, and survival are not protectable expressions.

22

Consequently, the Court finds that no ordinary reasonable person could conclude that Defendants unlawfully appropriated Plaintiffs' protectable expression of the plot or sequence of events in *The Maze*.

### (2) Themes

Plaintiffs summarily claim that the themes of the works—survival of the fittest and innocence lost—are substantially similar. The themes of survival of the fittest and innocence lost are a common element in science fiction and horror genres and, therefore, are not subject to copyright protection.

### (3) Mood

Defendants assert that mood of the books differ significantly. The Court agrees. *The Maze* invokes a tone and style of a horror genre—creating a sense of panic, fear, alarm, or dread for the reader. Conversely, *The Maze Runner* falls within the dystopian fantasy/science fiction genre—a futuristic universe where oppression is frequently enacted by a totalitarian or authoritarian government or corporation. Hence, there are no similarities in the mood of the two literary works.

### (4) Setting

Plaintiffs claim that the settings in both books are identical: a maze. As noted above, the concept of a maze is not a protectable element. Nonetheless, a closer look at the competing mazes demonstrates that the mazes have no factual similarities. For example, in *The Maze*, the maze is contained within an office building in New York. Although Plaintiffs describe the maze as "giant," there is no textual support in the novel for this assertion. In addition, the maze's walls and staircases shift and change in composition as the contestants travel through the maze.

And, each room presents a formidable element that, generally, results in the death of a contestant.

*The Maze Runner*, on the other hand, is set outside in an area called the Glade.  The Glade spans approximately several football fields and is split into four sections:  an area for growing crops, sleeping quarters, animal pens, and a graveyard.  The Glade is encased by four concrete walls covered in ivy that separate the Glade from the maze.  Each wall is over a hundred feet tall and has a sliding door in its center that opens every morning and closes every night.  The maze consists of giant labyrinths divided into eight sections.  Every night the walls change, repeating the same pattern every month.  The pattern is a code that consists of keywords that are formed by the walls of the eight sections at a rate of one letter per day.

The Court finds there is no reasonable person could determine that the settings depicted in *The Maze* and *The Maze Runner* are substantially similar.

### *(5) Pace*

Likewise, the pace of the two books are not factually similar.  In *The Maze*, the protagonists are placed in very fast-paced situations within the maze.  And, the events unfold over mere hours.  In *The Maze Runner*, however, the events slowly occur over a series of days.  Indeed, there are sections of the novel that are fast-paced, *i.e.*, when the protagonist attempts to outmaneuver Grievers when trapped in the maze overnight.  The pace also slows during the protagonist's moments of self-reflection—exploring his connection to Teresa and recovering his memories.  But the majority of the novel is presented at a slower pace than *The Maze*.  Thus, it follows that no reasonable person could find that the pace of the books is substantially similar.

### *(6) Characters*

Plaintiffs claim there are substantial similarities between four of the five major characters

24

in the two literary novels.  Particularly, Plaintiffs assert Kevin from *The Maze* and Alby from *The Maze Runner* are substantially similar because they are both "Black leader[s]."  (Doc. 36) at 8 (citing (Doc. 5) at 18–21).  In *The Maze,* Kevin is never unequivocally or casually identified as the leader of the contestants.  Whereas in *The Maze Runner*, Alby is the elected leader of the Glade.

Plaintiffs also assert that Rob from *The Maze* is similar to an unidentified boy in *The Maze Runner* because they both have "square jaw[s]."  *Id.*  Plaintiffs further maintain that the "heavily muscled Asian kid" in *The Maze Runner* is similar to Ramon from *The Maze.  Id.*  Finally, Plaintiffs contend Winston, "an acne-covered kid" and an unidentified "short, pudgy boy" from *The Maze Runner* resemble Jay in *The Maze.*  None of these comparisons have merit; "[c]opyright law provides very limited protection to the characters presented in the creative work."  *Acker*, 46 F. Supp. 3d at 172 (internal quotation and citation omitted).  A character's obscure or general appearance is not a protectable expression.  *See Nichols v. Universal Pictures Corp.*, 45 F. 2d 119, 121 (2d Cir. 1930), *cert denied*, 282 U.S. 902 (1931).  Only well-developed characters may enjoy copyright protection.  *Id.* ("It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").  Therefore, Plaintiffs' asserted basic characteristics are insufficient to support a finding of substantial similarity.

In light of the aforementioned, the Court finds that no reasonable person would conclude that *The Maze* and *The Maze Runner* are substantially similar.  As a result, Plaintiffs' Complaint lacks any allegations, beyond Plaintiffs' conclusory statement, that Defendants' work, *The Maze Runner*, infringed on Plaintiffs' protectable expressions in *The Maze*.  Thus, Plaintiffs' Count I is subject to dismissal under Rule 12(b)(6).  It also follows that Plaintiffs' Count II is dismissed as

the substantive claim no longer remains to support a claim for injunctive relief.  Hence, those

claims will be dismissed with prejudice.

   C. *Unfair Trade Practices & Unfair Competition (Count III)*

      Defendants assert that Plaintiffs' state law unfair trade practices and unfair competition

claims are preempted by the Copyright Act, 17 U.S.C. §§ 101–1332.  Furthermore, Plaintiffs'

federal unfair competition claim for attribution falls within the exclusive province of federal

copyright law.  Plaintiffs counter that under New Mexico's notice only pleadings standard, the

Complaint sufficiently pleads the "state law or federal law claim in unfair trade practices and

unfair competition."  (Doc. 36) at 28.

   1. *Plaintiffs' State Law Claims*

      Section 301 of the Copyright Act describes the extent to which state common-law and

statutory causes of action are preempted.  It provides, in relevant part:

> (a) [A]ll legal or equitable rights that are equivalent to any of the exclusive rights
> within the general scope of copyright as specified by section 106 in works of
> authorship that fixed in a tangible medium of expression and come within the
> subject matter of copyright as specified by sections 102 and 103, whether created
> before or after that date and whether published or unpublished, are governed
> exclusively by this title.  Thereafter, no person is entitled to any such right or
> equivalent right in any such work under the common law or statutes of any State.
>
> (b) Nothing in this title annuls or limits any rights or remedies under the common
> law or statutes of any State with respect to
> . . .
>
> (3) activities violating legal or equitable rights that are not equivalent to any of the
> exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301.  "[A] state-law claim is preempted if (1) the work is within the scope of the

'subject matter of copyright' as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted

under state law are equivalent to any exclusive rights within the scope of federal copyright as set

out in 17 U.S.C. § 106."  *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1146 (10th Cir.

26

2009) (internal quotation and citation omitted).  Section 301 also "bars state law . . . claims with respect to uncopyrightable as well as copyrightable elements."  *Id.* at 1146-47.

Defendants maintain that Plaintiffs' claim meets both prongs of the preemption test:  *The Maze* is a literary work under 17 U.S.C. § 102(a)(1); and, Plaintiffs have not alleged a requisite extra element to distinguish the purported rights at issue from those conferred by copyright. Plaintiffs do not challenge either of Defendants' contentions.   And, as such, the Court finds that the first requirement is satisfied.  The Court, nevertheless, will review "whether the state-law rights asserted by [Plaintiffs] are equivalent to any of the exclusive rights within the general scope of copyright, as specified in 17 U.S.C. § 106."  *Id.* at 1147.

Section 106 of the Copyright Act grants copyright owners the exclusive rights to:  (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work to the public by sale; (4) perform the work publicly; and (5) display the work publicly.  17 U.S.C. § 106(1)–(6).  As explained by the Tenth Circuit, a state violation is deemed preempted, "[w]hen a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights."  *R.W. Beck, Inc.*, 577 F.3d at 1147 (internal quotations omitted).  The state law is not preempted if the state law violation is "predicated upon an act incorporating elements beyond mere reproduction or the like."  *Id.*

In Count III of the Complaint, Plaintiffs allege that:

*The Maze* by Tize Clark was in the public domain and was receiving healthy book sales and royalties to Tize Clark, in the summer of 2005. . . . [Defendant] Dashner published his novel . . . without consent or acknowledgment of its source and copyrightable material from 2009 to 2013 with million dollar sales of his book. From at least October 6 of 2009, and continuously since that date [D]efendant James Dashner and Random House (Delacorte Press) [sic] has been publishing, selling, and otherwise marketing the book, *The Maze Runner* by Dashner, to their profit and without credit and royalties to Tize Clark.

(Doc. 1) at 12 ¶¶ 43–47.  It is evident from the Complaint that Plaintiffs assert damages arising out of Defendants' publication and selling of *The Maze Runner* as their own original work. Because the nature of Plaintiffs' state law unfair trade practices and unfair competition claim flows from the "publication" of *The Maze Runner* that arose from the alleged copying of Plaintiffs' work, Plaintiffs' state law claim is preempted.  *See R.W. Beck, Inc.*, 577 F.3d at 1145– 49 (state law claims of unfair competition and unjust enrichment preempted by Copyright Act); *see also Ehat v. Tanner*, 780 F.2d 876, 879 (10th Cir. 1985) (nature of unfair competition claims based on "reproduction" of plaintiff's work are within scope of federal copyright).  Accordingly, Plaintiffs' state law claim in Count III is subject to dismissal for failure to state a claim with prejudice.[7]

### 2. *Plaintiffs' Federal Unfair Competition Claim*

Defendants assert that Plaintiffs' federal unfair competition claim is subject to dismissal because Plaintiffs' rights are limited to those provided by the Copyright Act, and, therefore, Plaintiffs cannot also pursue a Section 43(a) Lanham Act claim.  Defendants cite *Dastar v. Twentieth Century Fox*, 539 U.S. 23 (2003), to argue the Section 43(a) claim is barred as a matter of law.  Plaintiffs did not respond to Defendants assertion.

The Lanham Act, generally, "was intended to make 'actionable the deception and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'"  *Dastar*, 539 U.S. at 28 (ellipsis in original) (quoting 15 U.S.C. § 1127).  Section 43(a) of the Lanham Act provides, in pertinent part:

---

[7]  In the response, Plaintiffs summarily contend that if the Court grants Defendants' motion as to the "state law and federal law claim in unfair trade practices and unfair competition" the "Court permit amendment to separately state claim."  (Doc. 36) at 28.  As thoroughly addressed above, Plaintiffs' state law claims for unfair trade practices and unfair competition are preempted and, therefore, any amendment to the Complaint would be futile.  *See Brereton*, 434 F.3d at 1219.  Plaintiffs' request for amendment is, therefore, denied.

> Any person who, on or in connection with any goods or services, . . . uses in
> commerce any word, term, name, symbol, or device, or any combination thereof,
> or any false designation of origin, false or misleading description of fact, or false
> or misleading representation of fact which—
>
> (A) Is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to
> the origin, sponsorship, or approval of his or her goods, services, or commercial
> activities by another person . . . .
> . . .
>
> [S]hall be liable in a civil action by any person who believes that he or she is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

Here, in the Complaint, Plaintiffs allege Defendants published, sold, and marketed the book *The Maze Runner* as their own. This constitutes a claim of "reverse passing off," where Defendants "misrepresent[] someone else's goods or services as [their] own." *Dastar*, 539 U.S. at 27 n.1 (citation omitted). The Court agrees *Dastar* governs its evaluation of this claim.

In *Dastar*, the defendant purchased videos of a television series for which the copyright had expired, copied the videos, made some "minor" revisions, and then released the videos under a new title that referenced the defendant as the distributor and producer. *Id.* at 26–27, 31. The Supreme Court rejected the plaintiffs' reverse passing off claim under the Lanham Act for failure to credit the plaintiffs for the original videos. The Supreme Court held that the term "origin" as used in Section 43(a)(1) is "incapable of connoting the person or entity that originated the ideas or communications" contained in the produced goods. *Id.* at 32. In declining to recognize a cause of action under Section 43(a) "for, in effect, plagiarism," the Supreme Court found that such a holding would conflict with federal copyright law, "which addresses that subject specifically." *Id.* at 33, 36. The Court concluded:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance
> with the Act's common-law foundations (which were *not* designed to protect

originality or creativity), and in the light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

*Id.* at 37 (emphasis in original).

It follows that under *Dastar*, the Lanham Act does not prohibit the conduct complained of in this matter, *i.e.* Defendants' publication of *The Maze Runner*, which Plaintiffs allege is substantial similar to Plaintiffs' work, without crediting Plaintiffs. This type of allegation falls within the exclusive purview of federal copyright law. Thus, Plaintiffs may not state a federal unfair competition claim for the same alleged conduct that supports the copyright infringement claim. Consequently, Defendants are entitled to dismissal, with prejudice, of Plaintiffs' federal unfair competition claim in Count III.

IT IS, THEREFORE, ORDERED that

1. Defendants' Motion to Dismiss Complaint (DKT. #1) by Defendants Dashner and Random House (Incorporating Authorities) (Doc. 22) is granted; and

2. Plaintiffs' claims against Defendant James Dashner and Defendant Random House in Count I, Count II, and Count III in the Complaint (Doc. 1), filed October 24, 2014, will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE