IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TIZE W. CLARK, *author*, and
BAU PUBLISHING GROUP,

      Plaintiffs,

vs.                                              Civ. No. 14-00965 KG-KK

JAMES DASHNER, RANDOM
HOUSE LLC, TWENTIETH CENTURY
FOX, T.S. NOWLIN, NOAH OPPENHEIM,
and GRANT PIERCE MYERS,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Motion to Dismiss by Defendant Twentieth

Century Fox Film Corporation (Motion to Dismiss), filed January 20, 2015.  (Doc. 24).

Plaintiffs filed a response on February 20, 2015, and Defendants replied on March 13, 2015.

(Docs. 38 and 46).  Having reviewed Defendant's Motion to Dismiss, the accompanying briefs,

and the Complaint (Doc. 1), the Court grants the Motion to Dismiss.

*I.   The Complaint (Doc. 1)*[1]

On October 24, 2014, Plaintiffs initiated this action against Defendants, alleging

infringement on Plaintiff Tize W. Clark's (Plaintiff Clark) copyright of *The Maze*, a novel.  In

2002, Plaintiff Clark obtained a copyright in his 2002 manuscript titled, *The Maze*, Registration

---

[1]  For purposes of resolving a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pled facts as true.  Accordingly, the Court has relied upon Plaintiffs' Complaint in outlining the facts pertinent to this motion.  The Court, however, need not accept Plaintiffs' legal conclusions and conclusory statements in paragraphs 18, 19, 20, 21, 52, 53, and 56 of the Complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Number TXu 1-069-309 (*The Maze*).  (Doc. 1) at ¶¶ 12–13; *see also* (Doc. 22-1) at 2–3.[2]

Plaintiffs allege that the concept of *The Maze*—including the idea of a giant maze with moving

walls and robotic creatures—is Plaintiff Clark's original work.  *Id.* at ¶ 16.  In 2004, Plaintiff

Clark published an original version of *The Maze*; and in June 2005, Plaintiff Bau Publishing

Group published *The Maze* with the International Standard Book Number (ISBN) 0-9766770-0-

8.  *Id.* at ¶¶ 14, 25.  Also in June 2005, Plaintiff entered into a book distribution and sale

agreement with Barnes & Noble, Inc. and various other booksellers.  *Id.* at ¶ 15.  That same

month, Plaintiff Clark mailed a letter and two (2) copies of *The Maze* to Defendant Twentieth

Century Fox Film (Defendant Fox).  *Id.* at ¶ 49.  In the letter, Plaintiff Clark requested that

Defendant Fox contract with him for the rights to make *The Maze* into a feature film.  *Id.*  At

some point in 2005, Defendant Fox declined Plaintiff Clark's offer and returned one (1) copy of

*The Maze* to Plaintiff Clark.  *Id.* at ¶¶ 50–51.

 In 2006, Defendant James Dashner (Defendant Dashner) started writing *The Maze

Runner*.  *Id.* at ¶ 17.  In 2009, Defendant Dashner copyrighted *The Maze Runner*.  *Id.*  That same

year, Defendant Random House, L.L.C. (Defendant Random House) published *The Maze

Runner*.  *Id.*  On September 19, 2014, Defendant Fox released a feature film under the same title.

¶ 52.

 In Count I, Plaintiffs state a copyright infringement claim pursuant to 17 U.S.C. §§ 101–

1332 against Defendants Dashner and Random House.  *Id.* at ¶¶ 22–35.  In Count II, Plaintiffs

seek injunctive relief for the alleged copyright infringement.  *Id.* at ¶¶ 36–42.  In Count III,

Plaintiffs bring a claim for unfair trade practices and unfair competition based on Defendant

Dashner's and Defendant Random House's publication, selling, and marketing of *The Maze

---

[2]  Paragraphs twelve and thirteen of Plaintiffs' Complaint are identical.

*Runner* without credit or royalties to Plaintiff Clark. *Id.* at ¶¶ 43–47. Finally, in Count IV, Plaintiffs allege a copyright infringement claim pursuant to 17 U.S.C. §§ 101–1332 against Defendant Fox for the screenplay of *The Maze Runner*. *Id.* at ¶¶ 48–56.

Defendant Fox now moves to dismiss Counts I, II, and IV under Fed. R. Civ. P. 12(b)(6), with prejudice, for failure to state a claim upon which relief can be granted. To the extent that Plaintiffs allege unfair trade practices and unfair competition, Defendant Fox also moves to dismiss Count III with prejudice. Plaintiffs oppose Defendant Fox's Motion to Dismiss in its entirety.

## II. *Legal Standard*

In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true and must view them in the light most favorable to the plaintiff. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). Rule 12(b)(6) requires that a complaint set forth the grounds of a plaintiff's entitlement to relief through more than labels, conclusions and a formulaic recitation of the elements of a cause of action. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts sufficient to state a plausible claim of relief.[3] *Id.* at 570. A claim is facially plausible if the plaintiff pleads facts sufficient for the Court to reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Granting a Rule 12(b)(6), however,

---

[3] Notably, Plaintiffs contend the proper standard for a Rule 12(b)(6) motion is that the motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Doc. 36) at 2 (citing *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). In light of *Twombly* and its progeny, the Court will not entertain Plaintiffs' proffered legal standard.

"is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quotation omitted).

In evaluating a Rule 12(b)(6) motion, courts may also consider any attached exhibits, documents incorporated by reference, and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal quotations and citations omitted). And, "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Assocd. Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir. 1997).

*III. Discussion*[4]

Defendant Fox contends Plaintiffs' copyright infringement claims (Count I and Count IV) are subject to dismissal because a review of the parties' works demonstrates insufficient similarity of protectable expressions, and therefor, Plaintiffs' injunctive relief demand (Count II) also must be dismissed. Defendant Fox further contends Plaintiffs' state law unfair trade practices and unfair competition claims (Count III) are preempted by federal copyright law. Defendant Fox also contends that *Dastar Corporation v. Twentieth Century Fox Film Corporation*, 539 U.S. 23 (2003), bars Plaintiffs' federal unfair competition claim (Count III). Each contention will be discussed in turn.

A. *Comparison of the 2002 Manuscript of* The Maze *(Docs. 22-1 and 22-2) and the film,* The Maze Runner *(Ex. C)*

---

[4] On June 30, 2016, the Court granted Defendant Dashner's and Defendant Random Houses' Motion to Dismiss. (Doc. 69). The parties' arguments in the instant motion closely mirror the arguments addressed in (Doc. 69). As a result, this Memorandum Opinion and Order applies the same standards and relevant facts, with respect to the Complaint and *The Maze* manuscript. Further, in regard to this Memorandum Opinion and Order, the Court has conducted an independent analysis of the alleged infringed work, *The Maze*, and the alleged copied work, *The Maze Runner* film, in accordance with the applicable standard for copyright infringement in a Rule 12(b)(6) motion.

Plaintiffs argue preliminarily that in evaluating a Rule 12(b)(6) motion, the Court may not review and compare the copyrighted and infringed work. Plaintiffs' assertion is contrary to well-established case law. First, the Court may consider any documents incorporated by reference, and "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith*, 561 F.3d at 1098. Here, Plaintiffs attached excerpts of *The Maze* to the Complaint. *See* (Doc. 1-1); (Doc. 6). Indeed, the Complaint references both works, which are paramount to Plaintiffs' copyright infringement claim. Moreover, Plaintiffs do not dispute the authenticity of the 2002 manuscript, *The Maze* (Docs. 22-1 and 22-2), nor the film, *The Maze Runner* (Ex. C).[5]

Second, there is a dearth of jurisprudence in the context of a motion to dismiss where courts have examined the copyrighted and infringed work to determine whether the works are substantially similar. *See Effie Film, LLC v. Murphy*, 564 Fed. Appx. 631 (2d Cir. 2014); *Wild v. NBC Universal*, 513 Fed. Appx. 640 (9th Cir. 2013) (citing *Christianson v. West Pub. Co.*, 149 F.2d 202 (9th Cir. 1945)); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir. 2002); *Tanikumi v. Walt Disney Co.*, 2015 WL 716429 (D.N.J. Feb. 19, 2015); *Boston Copyright Assocs., Lts. v. U-Haul Int'l, Inc.*, 2015 WL 666952 (D. Mass. Feb. 17, 2015) (citing *Winstead v. Jackson*, 509 Fed. Appx. 139 (3d Cir. 2013) ("[W]here the works in question have been submitted by the parties and are authentic, it is proper for the District Court to consider the similarity between those works in connection with a motion to dismiss."); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010); *Nelson v. PRN Prods., Inc.*,

---

[5]  Notably, Plaintiffs attached the alleged 2005 edition of *The Maze* to the response. *See* (Doc. 38-1). A review of (Doc. 38-1) does not indicate whether the proffered document is the actual 2005 edition. For instance, Plaintiffs did not attach the front matter section of the book, which includes the book's title, the author's name, and the copyright and publication information. Despite this issue, the Court has carefully read and compared the 2002 manuscript and the alleged 2005 edition. The Court finds that any discrepancies between the two editions are inconsequential to the disposition of the instant motion. The Court, thus, relies upon the undisputed authenticated copyrighted 2002 manuscript for purposes of this motion.

873 F.2d 1141 (8th Cir. 1989)); *Acker v. King*, 46 F. Supp. 3d 168 (D. Conn. 2014); *Dean v. Cameron*, 53 F. Supp. 3d 641 (S.D. N.Y. 2014);  *Harris v. Mattel Inc.*, 2013 WL 3154124 (E.D. Okla. June 21, 2013).  In light of this precedent, the Court will review and compare the copyrighted 2002 manuscript of *The Maze* and the 2014 film, *The Maze Runner*.

   B.   *Copyright Infringement (Count I & Count IV)*

   Defendant Fox first argues that Plaintiffs' copyright infringement claim must fail because Plaintiffs erroneously seek protection of unprotectable elements in *The Maze*, including the "ideas and concepts" of mechanical/robotic creatures and a giant maze with moveable walls. Defendant Fox further contends that Plaintiffs fail to state a claim for copyright infringement because the film, *The Maze Runner*, is not substantially similar to Plaintiff Clark's *The Maze*.  In support of its assertions, Defendant Fox submits the 2002 manuscript of *The Maze* (Docs. 22-1 and 22-2) and the 2014 Digital Versatile Disc of *The Maze Runner* (Ex. C).

   A plaintiff must prove two elements to establish copyright infringement:  "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012) (internal quotation omitted).  In this matter, Defendants do not dispute the sufficiency of Plaintiffs' pleadings as to the first element. Hence, only the second element—copying—is at issue.

   The copying element consists of two components.  *Id.* (internal citation omitted).  First, a plaintiff must show a defendant copied the plaintiff's work "as a factual matter."  *Id.*  (internal quotation omitted).  Second, a plaintiff must demonstrate a "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected." *Id.* (internal quotation omitted).  This second component, "a question of law and fact, determines whether a defendant's factual copying constitutes actionable infringement."  *Id.*

6

Defendants do not raise an issue with the first component, thus, only substantial similarity is at issue.

"To decide the substantial similarity issue, a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to the accused work." *Savant Homes, Inc. c. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (citing *Blehm*, 702 F.3d at 1200).  A court may address either step first.  *Id.* (citing *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 833 (10th Cir. 1993)).

(a) *Protectable Elements*

Section 102(a) of the Copyright Act protects "original works of authorship."  17 U.S.C. § 102(a).  "Originality exists where a 'work was independently created by the author (as opposed to copied from other works), and . . . it possesses at least some minimal degree of creativity.'" *Savant Homes, Inc.*, 809 F.3d at 1138–39 (citing *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 345 (1991)).  The requisite level of creativity is "extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  *Id.*  As a result, the originality requirement separates protectable elements from unprotectable elements of a copyrighted work.  *Id.*

"In no case does copyright protection for an original work of authorship extend to any *idea* . . . [or] *concept* . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b) (emphasis added).  "This provision enshrines the 'fundamental tenet' that copyright 'protection extends only to the author's original expression and not to the ideas embodied in that expression.'"  *Blehm*, 702 F.3d at 1200 (quoting *Gates Rubber Co.*, 9 F.3d at 836).  Significant to this case, under the "*scenes a faire doctrine*,"

7

copyright protection is denied to those expressions of idea "that are standard, stock, or common to a particular topic, or that necessarily follow from a common theme or setting." *Gates Rubber Co.*, 9 F.3d at 838.

In this matter, viewing the alleged facts as true and in the light most favorable to Plaintiffs, the Court finds Plaintiffs have not sufficiently pled factual allegations to state a claim of relief for copyright infringement. Plaintiffs allege the "concept" and "idea" of a giant maze with moving walls and robotic creatures are original protectable "ideas." *See* (Doc. 1) at ¶¶ 16, 19–20. Plaintiffs, however, do not have a monopoly on the idea of individuals and/or teenagers attempting to escape a giant maze, but are consistently thwarted by formidable elements. Indeed the theme of a complex and dangerous "maze" exists in Greek mythology.[6] And the concept has been revitalized in recent decades. *See, e.g.*, J.K. ROWLING, HARRY POTTER AND THE GOBLET OF FIRE (Scholastic 2000) (a maze tournament); UMBERTO ECO, NAME OF THE ROSE (Harcourt 1983) (murder mystery involving a labyrinth); URSULA K. LE GUIN, TOMBS OF ATUAN (London Gollancz 1972) ("coming of age" female navigates a dark labyrinth). Put simply, Plaintiffs cannot copyright the idea of a maze wherein occupants are challenged, tormented, and killed—environments often central to the protagonist's perseverance in science fiction, dystopian, and horror genres.

Nor may Plaintiffs copyright the concept or idea of biomechanical creatures—imagery and characters also prevalent in the science fiction, dystopian, and horror genres. *See* SCOTT WESTERFELD, LEVIATHAN (THE LEVIATHAN TRILOGY) (Simon Pulse 2010) (airships made from bioengineered creatures); SUZANNE COLLINS, HUNGER GAMES BOOK ONE (Scholastic Press 2009) (mutated mutts with metallic plates); PHILIP K. DICK, DO ANDROIDS DREAM OF ELECTRIC

---

[6] *See* LABYRINTH, www.ancient.eu/Labyrinth (last visited June 14, 2016).

SHEEP? (Del Rey 1996) (bounty hunter tracks fugitive androids).[7]

Accordingly, the elements of a dangerous maze and robotic creatures are unprotectable *scenes a faire*, as these elements often recur in science fiction, dystopian, and horror genres. The Court, therefore, finds the Complaint lacks any allegations, beyond Plaintiffs' conclusory statement, that Defendant Fox infringed on Plaintiffs' protectable expressions of a giant maze and robotic creatures. Thus, Plaintiffs' Count I and Count IV are subject to dismissal with prejudice under Rule 12(b)(6). *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

*(b) Substantial Similarity*

Assuming *arguendo* that Plaintiffs' ideas and concepts are protectable, the Court finds that Plaintiffs' allegation of "substantial similarity" cannot be supported.

"Once a court has distinguished between unprotected ideas and protected expression in a copyrighted work, it must determine whether the protected elements are substantially similar to the accused work." *Blehm*, 702 F.3d at 1202. The issue of substantial similarity is, ordinarily, a question of fact. *Jacobsen*, 287 F.3d at 943. When both the infringing work and copyrighted work are before the Court on a motion to dismiss, however, "the Court may consider the works themselves and determine as a matter of law whether the allegation of substantial similarity can be supported." *Harris*, 2013 WL 3154124, at *3 (citing *Peter F. Gaito Architecture, LLC*, 602 F.3d at 63–64; *Jacobsen*, 287 F.3d at 941. "Substantial similarity exists when the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the

---

[7] *See also* ARTIFICIAL INTELLIGENCE —A TREND IN YOUNG ADULT SCIENCE FICTION, www.goodreads.com/list/show/22515.Artificial_Intelligence_A_Trend_In_Young_Adult_Science_Fiction (last visited June 14, 2016) (listing thirty-seven novels that incorporate "human-like cyborgs, androids, partial humans, engineered human-tissue slaves, robots, and humanoid life-forms").

defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Savant Homes, Inc.*, 809 F.3d at 1140.  Furthermore, when assessing substantial similarity between literary works, courts consider a variable list of characteristics, including "plot, theme, dialogue, mood, setting, pace, characters, and sequence of events." *Shaw v. Lindheim*, 919 F.2d 1353, 1359 (9th Cir. 1990).

In accordance with the foregoing standard, the Court endeavors to compare *The Maze* and the film *The Maze Runner*—in their entirety—in order to determine whether the allegation of substantial similarity within the Complaint can be supported.  *See Jacobsen*, 287 F.3d at 945–46 (comparing two literary works); *Harris*, 2013 WL 3154124, at *3 (comparing cover art).

### (i)  *The Maze (Docs. 22-1 and 22-2)*

*The Maze* begins with a prologue set on May 24, 1939, where Monroe Anton Xavier, also known as "Max," travels with his older brother Chris, and their parents from the Bronx to Coney Island Amusement Park in Brooklyn, New York.  After the family arrives at the amusement park, Max reluctantly follows Chris into the Hall of Mirrors.  Upon entering the Hall of Mirrors, Chris abandons Max and taunts him throughout the maze.  Max becomes fearful and Chris attempts to help Max through the maze, but once again leaves Max behind by running through an exit door.  Chris, however, accidentally leaps "legs first" through a mirrored reflection of the exit door.  Max stands in horror as Chris' spine is severed by a piece of glass and, shortly thereafter, a section of the mirror falls and decapitates Chris.  Due to the traumatic event, Max becomes the "stone-hearted" head of a multi-billion dollar international conglomerate.

The remaining chapters are set in present day New Mexico and New York.  *The Maze* focuses on the story of Jay, Ramon, and Rob—three nineteen-year old males from Truchas, New Mexico.  Jay is a short, tentative, acne prone individual who is often bullied by Ramon and Rob.

Rob is athletic, vain, and cocky.  Ramon is hot-headed and extremely poor.  The three men see a television advertisement promoting a multi-billion dollar bequest from Max to anyone who can make it through his maze.  Confident that they can succeed because they grew up navigating the mountainous maze-like terrain of Truchas, they enter the contest.  The catch, the three men must travel to New York in order to participate in Max's maze.  The men prepare for their impending travel and celebrate their potential fortune at the Torching of Zazobra in Santa Fe, New Mexico.  During the event, Rob and Ramon ditch Jay.  Feeling despondent, Jay throws a wish into the burning Zazobra ashes.  Subsequently, Zazobra's head falls at Jay's feet, smiles, and spits out a burnt piece of paper at Jay.  Jay grabs the piece of paper and quickly runs away into the night.

The following day, the three men embark on their trip to New York.  The boys travel to the airport by limousine.  During the ride, Rob has a very vivid nightmare about a boy with "razor sharp broken teeth" breaking and biting his arm off.  When the men land in New York, they realize they need further instructions to travel from the airport to the maze.  Waiting outside the airport for instructions, a man approaches the three men and retrieves a wallet from the front zipper of his pants.  He throws the wallet at Ramon.  When they open the wallet, the men discover a note directing them to an underground train station for the "D" train.

When the men finally arrive at the "D" train platform, they must once again await further instructions.  After the train arrives, a tremendously obese man approaches Rob.  The man begins to reach into his pocket when dozens of cockroaches start scattering from the man's pocket, up his arm, and onto his face.  Releasing a hideous laugh similar to the boy from Rob's nightmare, the man places a note covered in maggots and roaches in front of Rob.  Ramon, in Rob's defense, strikes the man with a stick, causing millions of maggots to fall from the man's clothes.  Suddenly, the man leaps in front of an oncoming train.  Upon impact, the man's body implodes

releasing "hundreds of rats and bugs drenched in blood."  After the ensuing pandemonium, Rob

notices the final instructions to the maze.

      The final note directs the three men to enter the train tunnel, "take thirteen large steps,"

turn right, and follow a "fifteen-foot hallway" to a large black door.  After debating whether to

withdraw from the maze, the men follow the directions.  They arrive at the door and Rob opens

the door and "thousands of rats pour out" into the hallway.  The men attempt to escape the rats

by retreating to the tunnel; however, the hallway is now mysteriously enclosed.  The room fills

quickly with rats and the men panic.  Abruptly, a wall rises exposing a hidden room.  As the wall

rises a strong gust of wind blows the rats in the opposite direction.  Once free of the rats, "the

platform" below the men ascends rapidly.  Realizing the platform may collide with the ceiling,

the men lie on their backs and place their feet on the ceiling to stop the impending collision.

Finally, the ceiling splits in two like a bridge.  A welcoming committee cheers, "Welcome to the

Maze!" and the men notice they are in an office.

      Three of Max's employees give the men a tour of the business complex.  After the men

eat, a hostess directs Jay, Rob, and Ramon into a dark room where five other individuals are

sitting.  Jay, Rob, and Ramon learn that the five individuals are also maze contestants.  Ramon,

shortly thereafter, gets into an altercation with tall, bald headed, "dark brown skin" contestant,

Kevin Johnston.  A hostess informs the contestants that fighting before the maze will result in

immediate disqualification; and the disqualified contestant will be "injected with a chemical that

will cause" the contestant to "forget [his/her] trip to the maze."  The hostess then verifies that the

contestants are of legal age and introduces the remaining contestants:  a "young lady" named

Kenya Harris; a "young lady" named Kisha Grant and her dog Mr. Shakes; Sean Levan; and

Ricky Harris, Kenya's younger brother.  After introductions, the contestants are required to sign

12

contracts stating that M.A.X. Enterprises is not responsible for any injuries, death, or accidental death within the maze.

The hostess informs the eight contestants that they may enter the maze through the door on the opposite side of the wall.  All the contestants enter the first room of the maze, which is empty.  The contestants discover another door, which leads to another empty room.  After walking through three empty rooms, the contestants enter a room of mirrors that smells like "the sweet aroma of candy flavored popcorn," and notice a sign stating hall of mirrors "in an old amusement park lettering style."  Unable to find an exit, the contestants attempt to backtrack to the prior room.  The door, however, slams shut and is covered by a mirrored wall.  Frustrated, Kevin and Ramon get into an altercation.  Kevin throws Ramon through several mirrored walls revealing a hidden room that smells like rotten corpses.

The new room is a dark and steamy stairwell with steel gated floors.  And the railings are covered in strips of human flesh and blood.  Kisha ends up separating from the group.  The group attempts to follow Kisha, but the walls shift and isolate Kisha from the group.  The group continues their journey down the stairs, into a corridor, and up another stair case.  The staircase leads the group to a beautiful full size flower garden that resembles the "Botanical Garden in the Bronx."  Quickly, the room divulges its true function as a graveyard for the prior contestants and eight new burial plots.  Frightened, they flee the graveyard through an opening in a gate.  As the contestants walk through the maze the walls raise and switch from left to right exposing a variety of walls:  brick walls, solid steel beams, wallpapered walls, and walls covered in picture frames.

Soon, the contestants come upon another flight of stairs covered in powder pink carpeting and emitting a baby powder odor.  While the contestants climb the stairs, Sean notices a ray of light coming through a door in the opposite direction of the stairs.  Thinking it is an exit, Sean

runs through the door. The door slams shut and is replaced by a wall of steel beams. The silence is filled by Sean's "[t]errifying screams" and the "loud snapping" of his bones. Once Sean's screams subside, a rumbling noise starts and Sean's remains are tossed over the wall and onto Jay.

Kisha, still separated from the group, also enters a room that smells like baby powder and is covered in powder pink carpeting. Kisha discovers an abandoned baby in the room and immediately consoles the baby and attempts to breastfeed the baby. After Kisha is unable to produce milk, the baby screams profanities and its mouth mutates into "huge oversized teeth" that protrude like "fangs." The baby mauls Kisha's chest and, eventually, eats her whole.

The remaining six contestants, hearing Kisha's screams, stay huddled close together. The maze, nonetheless, transforms again placing the contestants in a bright room where they are showered with blood. In a panic, the contestants run up a flight of stairs, which begin to rise like it is "elevating them to a new level." The staircase abruptly ceases and a door is revealed at the bottom. The new room displays brick walls with large metal linked dog chains. After hearing dogs growl and bark, the group quickly ascends the stairs once again. The maze, however, shifts and a wall opens revealing massive pit bulls. As the group frantically runs up the staircase, Kenya is pushed over the edge of the maze where she lands on a transparent platform. The group carefully descends to the platform to assist Kenya. Despite their assistance, Kenya refuses to move. Kevin attempts to jump over her and falls straight down landing feet first into the motor of the maze.

After they watch Kevin die, the five constants follow the transparent floor to an open door. Once in the new room, Jay and Rob notice Ricky disappeared. Kenya explains that her brother is a womanizer and selfish. The four of them decide to continue without Ricky. As they

14

start walking through the maze, the walls continue to shift.  Eventually, another wall shifts revealing a staircase to a lower level.  When they start to descend they notice the cannibal baby at the bottom of the stairs and run in the opposite direction.  The staircase, surprisingly, rotates, flips, and places the contestants in another room.

This new room displays beautiful art, including Michelangelo's David and the ceiling of the Sistine Chapel.  The room also includes a two way mirror into another room.  Kenya, Jay, Rob, and Ramon watch as Ricky enters the room and encounters a beautiful and frightened woman.  After Ricky consoles the woman, she and Ricky engage in intercourse.  The woman, however, is a robotic creature that pulverizes Ricky's entire body through her vagina and then throws up his remains.  In shock from witnessing her brother's death, Kenya rushes out of the room before the entryway closes.  Jay, Rob, and Ramon start to look for an exit when Michelangelo's David comes to life and attempts to urinate acid on them.  The contestants flee the room through a hidden small square opening with a slide.

The maze continues to mentally torment the contestants as the walls shift prolonging their journey.  Unexpectedly, the maze's walls collapse leaving the maze exposed.  Kenya, noticing the three men, sprints across the giant hall as walls quickly rise behind her.  Kenya attempts to dive to the men, when she is suddenly encased by four walls.  After being tormented by the sounds of trains the room is flooded by large rats.  Despite her attempts to fight the rodents, Kenya eventually is engulfed by a thousand rats and killed.

Jay, Rob, and Ramon, safe from danger, find three large black steel doors.  Ramon approaches the left door; when he touches the handle a strong gust of wind blows through the maze tousling his hair.  Ramon opens the door and massive pit bulls leap out at him and surround him.  At that same time, Rob opens the right door and rats flood the area.  The pit bulls,

distracted by the rats, abandon their post over Ramon.  Rob hastily opens the middle door to discover day light.  Rob and Ramon sprint through the middle door and are immediately decapitated by a huge razor sharp steel rod.  Jay, on the other hand, runs through the doorway and is unharmed.  Tormented by the events of the maze, Jay exits the maze as the winner and as a "mad man, like Max."  The novel concludes with the narrator revealing that Zazobra granted Jay's wish.

(ii) <u>The Maze Runner Film</u> (Ex. C)

*The Maze Runner* film begins with a boy, the protagonist, waking up in an upwardly moving metal box, known as "the Box."  When the Box stops, the doors open overhead revealing a community of approximately thirty plus boys ranging from teenagers to young adults laughing at the protagonist.  One boy yells, "go get him," and Gally, another boy, jumps into the Box and greets the protagonist with, "Day one, Greenie.  Rise and shine."  The protagonist attempts to run away from the group of boys, but trips during his escape.  The boy is then placed in "the pit" until Alby, the leader of the boys, speaks with the protagonist.  When the protagonist struggles to recall any memories—including his name—Alby informs him that "in a day or two" only the memory of his name will return.  Alby then explains that the Box sends a new "greenie," *i.e.* a new boy, once a month with fresh supplies.  Otherwise, the boys must provide for themselves. The boys do not know who or what sends the Box.  The protagonist also learns that the area where the boys live is called, "the Glade," a farm-like expanse setting encased by large concrete walls covered in ivy.  The protagonist is also informed to never go beyond the Glade, specifically, to never enter the maze.  This rule intrigues the protagonist, who becomes fascinated with the maze.

16

That evening, during a bon fire, the protagonist learns that the maze doors—gigantic concrete sliding doors—open every morning and close every night.  When the doors open, boys known as "Runners" literally run into the maze in an attempt to map the maze to find an exit.  The Runners are led by Minho.  Minho and his fellow Runners, however, have not discovered an exit after three years of mapping because the maze changes every night.  In addition, if a Runner fails to return to the Glade before the doors close he will be stuck in the maze overnight.  No Runner has survived a night in the maze due to "Grievers," mysterious creatures.  Soon after learning this information, the protagonist and Gally spar.  The protagonist knocks his head and remembers his name, Thomas.  That night, Thomas has vivid dreams of other kids and adults, including a young girl, and a woman saying, "Wicked is good."

The next day, while searching for fertilizer, Thomas is attacked by Ben, a Runner.  Ben was stung by a Griever while running the maze during the day time.  A new occurrence as Grievers only roam the maze at night.  Thomas tells Alby that during the attack Ben told Thomas that "it was all his fault," and that Ben saw him.  Alby explains that when a boy is stung by a Griever they go through, "the Changing."  The Changing is an infection that causes the boy to become extremely volatile.  Because there is no cure for the Changing, Ben is exiled to the maze.  Thomas' vivid dreams reoccur that evening.

On Thomas' third day in the Glade, Alby and Minho leave to run the maze.  When Minho and Alby do not return at the expected time, Thomas becomes intrigued and approaches the maze.  As the doors begin to close, Thomas notices Minho attempting to carry an unconscious Alby to the exit.  Thomas runs into the maze in an attempt to help Minho, but the doors close before they can escape.  Minho explains that Alby was stung by a Griever and, due to Alby's aggressive state, Minho had to knock him unconscious.  Shortly thereafter, Minho and Thomas

17

hoist Alby to safety by strapping him to a section of ivy on the maze wall.  When a Griever arrives, Minho flees.  Thomas, however, out maneuvers the Griever and saves Alby's life and his own.  The next morning, Thomas, Alby, and Minho, exit the maze as the first boys to survive a night in the maze.  Minho informs the boys that Thomas killed a Griever.

Outraged that Thomas entered the maze, Gally calls for a meeting at Counsel Hall. There, he argues that Thomas must be punished for breaking the carnal rule:  do not enter the maze.  Gally also predicts that more trouble will follow because Thomas killed a Griever. During the meeting, the Box arrives.  Everyone is slightly panicked as the Box was not expected for almost another month.  The box contains an unconscious girl and no supplies.  The girl is holding a note, "She is the last one ever."  The girl suddenly awakens and says, "Thomas," before becoming unconscious again.  Thomas does not recognize the girl.

Thomas decides to reenter the maze to find the Griever that he killed.  Minho recruits other boys to accompany him and Thomas into the maze.  Thomas, Minho, and three other boys enter the maze.  When they find the Griever's body, they notice its half mechanical and half arachnid.  Minho and Thomas discover a tracker embedded in the Griever's organs.  On the tracker is the electronic number seven (7) and the acronym W.C.K.D., the same acronym that is on the monthly supplies.

Furious that Thomas broke the rule once again, Gally urges Newt, the new leader, to punish Thomas.  Newt sentences Thomas to one night in the "pit," a makeshift cell, but also promotes him to Runner so that he may freely enter the maze.  Minho then escorts Thomas to a hut that holds a small replica of the maze.  Minho informs Thomas that the Runners completed mapping the maze and they cannot find an exit.  Thomas also learns that the outer sections are

numbered one thru eight.  When the maze changes at night, a different section opens, but not in numerical order—there is a particular pattern.

The boys then inform Thomas that the girl is awake.  Thomas finds the girl hiding in a tree house like building.  She knows her name, Teresa, but like the boys, she has no other memories.  Teresa and Thomas discover that they share extremely similar dreams, including a woman saying, "Wicked is good."  Teresa also shows Thomas that she found two full syringes in her pocket.  Thomas realizes that the syringes contain a cure for the Changing.  Teresa injects Alby with the serum.

The next day Minho and Thomas run the maze and discover that section seven is open, out of the normal rotation.  While in section seven, the tracker they pulled from the dead Griever becomes active.  The tracker leads Minho and Thomas to a hidden door.  They carefully approach the door.  As they near the door an alarm sounds and the "blades," the interior walls of the outer section of the maze, start to rotate.  Realizing that section seven is closing rapidly, Minho and Thomas narrowly escape section seven.

Once they return to the Glade, Minho and Thomas alert the boys that they discovered a possible exit.  Gally becomes concerned that Thomas' actions will have additional consequences.  Teresa informs the boys that Alby is awake.  Thomas asks Alby what he saw during the Changing.  Alby tells the boys that he remembers Thomas and the Creators.

The boys leave Alby when they realize that the maze door did not close for the evening.  Suddenly, the other three maze doors open.  Thomas, realizing that Grievers will enter the Glade, instructs the other boys to grab weapons and barricade themselves within Counsel Hall.  Unfortunately, the Grievers attack at that moment.  The boys and Teresa attempt to fight off the Grievers.  Many of the boys, including Alby, are killed or taken by the Grievers.  At the end of

the attack the Glade is destroyed and only a handful of boys remain.  Gally, in a rage, blames Thomas for the Griever attack.  Thomas, realizing only his memories will reveal necessary answers, stabs himself with a Griever stinger that was severed during the attack.

The next morning, Thomas wakes up next to Teresa inside the pit.  He learns that Gally has taken control of the Glade and banished Thomas and Teresa.  Thomas informs Teresa, Minho, Newt, and another boy named Chuck, that the Glade is a test.  When they were kids, people would give them challenges.  After a while, every month one kid would be sent to the Glade.  Thomas further explains that he and Teresa were instrumental in creating the Glade and the maze.  Despite this information, Newt encourages Thomas to help them find the exit within the maze.

The other boys bring Thomas and Teresa to Gally, who offers them as a sacrifice to the Grievers.  Gally states that if the Grievers take Thomas and Teresa, they will leave the Glade alone.  Teresa disagrees and encourages the boys to leave the Glade.  Before Thomas and Teresa can be offered to the Grievers, Thomas' friends fight Gally and his followers and free Thomas and Teresa.  Thomas pleads with Gally and others to follow him into the maze.  Some of the boys join Thomas; Gally and others remain.

Thomas, Teresa, and the band of boys enter section seven of the maze.  When they arrive at the exit, a Griever is guarding the door.  The boys attack the Griever.  As they charge the Griever, more Grievers attack.  While Thomas and the boys fight the Grievers, Teresa and Chuck discover that the exit requires an eight-digit code.  In the moment, Thomas infers that the eight section sequence of the maze relates to the exit code.  Teresa enters the code, and the door flashes, "Complete."  Suddenly, outer doors slam down on the Grievers, killing them instantly.  A door opens behind the boys revealing a long subterranean hallway that leads to another door.

Thomas opens the final door to unearth a secret lab.  The lab is destroyed; riddled by bullet holes.  All of the individuals within the laboratory are dead.  Thomas presses a button and a video plays.  In the video, Dr. Ava Paige explains that the sun scorched the earth—creating famine and global devastation.  More significantly, the scorch created "the Flare," an incurable virus that attacks the brain.  It is eluded that the boys and Teresa are immune to the virus.  In order to find a cure, they tested Thomas, Teresa, and the rest of the boys to study their brain activity.  The video also documents that during Dr. Paige's monologue, mercenaries attacked the laboratory, killing the workers.  The video concludes with Dr. Paige saying, "Wicked is good," before she commits suicide.

When the video ends, another door opens revealing the final exit.  When the boys attempt to leave, Gally appears.  Teresa notices that Gally is stung.  Gally tells them that there is no escape and raises a gun at Thomas.  Minho throws a spear at Gally and kills him.  Chuck, unfortunately, is hit by a bullet from Gally's gun.  Chuck dies.  Quickly, the mercenaries reenter the lab and rescue all of the boys and Teresa.

In the final scene of the movie, it is revealed that Dr. Paige is alive.  She informs a boardroom that the first phase of the trial is a success due to the surprising number of survivors.  She especially praises Thomas.  And, phase two may now commence.

*(iii)  Substantial Similarity Analysis*

Based upon the comparison of *The Maze* and *The Maze Runner* film, the Court finds that no reasonable person could conclude that the two works are substantially similar beyond the level of generalized or otherwise unprotectable ideas.  Although the works do share some similarities—*i.e.*, a giant maze, shifting walls, and robotic creatures—the manner in which the authors *express* those ideas varies tremendously.

*(1)   Plot/Sequence of Events*

Plaintiffs assert that the stories of the two works clearly demonstrate substantial similar plots.  The similarities between the two plots are either too general or concern unoriginal components, which do not enjoy copyright protection.

Plaintiffs first allege that the protagonists' entrances into the mazes are substantially similar.  In a limited context, this assertion bears some weight because the protagonists enter the maze via a mechanical lift.  However, there are no factual similarities as to how the protagonists arrive at the lift.  In *The Maze*, the protagonists' journey to the lift includes extensive travel and hurdles such as traveling to another state, waiting for instructions, being tormented by a tremendously obese man who eventually explodes into hundreds of bloody rats and bugs, walking through a smelly tunnel, and being attacked by rats before arriving at the lift.  When the lift opens the three protagonists are greeted by a welcome committee cheering, "Welcome to the Maze."  In contrast, in *The Maze Runner*, the movie opens with the protagonist in a lift, surrounded by a wild boar and supplies, and no memory of how he arrived in the Box.  When the Box is opened, an unknown boy yells, "Go get him," and Gally jumps into the Box and greets Thomas with, "Day one, Greenie.  Rise and shine."  Nor do the boys arrive as group.  Rather, a single boy is delivered to the Glade on a monthly basis.  Additionally, the concept or idea of an ascending underground platform is not novel in the realm of fiction.

Plaintiffs further assert that both plots are substantially similar because the characters navigate giant mazes with shifting walls, all the while attempting to survive from robotic creatures.  In essence, Plaintiffs argue that the characters share the same motivating factor: escape the maze in order to survive.  Plaintiffs' general similarities do not qualify as substantial.  *See Blehm*, 702 F.3d at 1200 (copyright protection extends to original *expression*, not general

ideas embodied in expression); *see also Gates Rubber Co.*, 9 F.3d at 838 (expressions of idea "that are standard, stock, or common to a particular topic, or that necessarily follow from a common theme or setting" are not protectable). Indeed, contrary to Plaintiffs' contentions, Plaintiff Clark's and Defendant Fox's expressions of the shifting walls—how or why the maze was created, when the walls shift, and the composition of the walls—contain no factual similarities. In *The Maze*, Max, a madman, created the maze with actively shifting walls and staircases to terrorize the contestants. Each shift placed the contestants in another treacherous and freighting scenario and typically resulted in the death of a contestant. Additionally, the composition of the walls randomly changes from brick, to steel, to wallpaper, and walls covered in picture frames and art. In the end, the three protagonists discovered the exit because three doors mysteriously appeared in front of them. Distinctly, in *The Maze Runner*, W.C.K.D. created the maze as an experiment to test the boys and find a cure for the Flare. The maze is constructed of tall stones covered in ivy. More importantly, every night the walls shift, creating a new pattern that is repeated monthly. Only once in the film did the maze shift while Minho and Thomas were inside the maze. In addition, Thomas determined that the eight-section sequence revealed a digital code that opened the escape hatch within the maze. Thus, the context of the shifting of the walls is markedly different and cannot support a finding of substantial similarity.

Next, the factual similarities between the botanical garden in *The Maze* and the Glade in *The Maze Runner* are not substantial. In *The Maze*, the contestants discover a beautiful botanical garden with a fish pond. Shortly after entering the room, they observe that the room is a graveyard for past contestants; and it contains burial plots for each new contestant. Frightened, the contestants exit the room through a gate. In *The Maze Runner*, the Glade serves as the living

space for the Gladers and is separated into sections:  a forest; sleeping quarters; and a farming

section.  There is no graveyard in the Glade.  The Glade is encased by four large walls that

separate it from the maze—it is not part of the maze.  Based on the aforementioned, the Court

finds that no reasonable person would determine that the botanical gardens and the Glade are

substantially similar.

Plaintiffs further claim the plots are similar because they contain mechanical creatures

that kill teenagers.  In *The Maze*, the maze is designed to play on the contestants' fears and

character traits.  For example, Kisha is mauled and eaten by the baby she cannot have because

she's infertile, and Ricky, the womanizer, is killed by a beautiful mechanical woman.  The maze

also incorporates small dog size rats, statues that come to life, and massive pit bulls with their

insides turned out.  The only "mechanical" being is the woman who killed Ricky.  Conversely,

the Grievers in *The Maze Runner* are the only mechanical creatures that attempt to kill the boys.

The Grievers—other than being biomechanical—bear no resemblance to the mechanical woman,

the cannibal baby, large rats, or the massive pit bulls described in *The Maze.*  Moreover,

mechanical creatures in the science fiction, dystopian, and horror genres amount no more than a

*scene a faire* in those genres.  Consequently, the Court finds no reasonable person would find the

creatures of the two works to be substantially similar.

The remaining plot similarities identified by Plaintiffs are alleged at an abstract level of

generality.  Specifically, Plaintiffs allege that scenes with narrow escapes, chasing scenes, and

scenes involving suspense and survival are substantially similar.  "It has long been recognized

that all fictional plots, when abstracted to a sufficient level of generalization, can be described as

similar to other plots."  *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D. N.Y. 1990).  Basic plot

*ideas* involving suspense, horror, murder, narrow escapes, and survival are not protectable expressions.

Consequently, the Court finds that no ordinary reasonable person could conclude that Defendant Fox unlawfully appropriated Plaintiffs' protectable expression of the plot or sequence of events in *The Maze*.

### (2) Themes

Plaintiffs summarily claim that the themes of the works—survival of the fittest and innocence lost—are substantially similar.  The themes of survival of the fittest and innocence lost are a common element in science fiction and horror genres and, therefore, are not subject to copyright protection.

### (3) Mood

Defendant Fox asserts that the mood of the books differ significantly.  The Court agrees. *The Maze* invokes a tone and style of a horror genre—creating a sense of panic, fear, alarm, or dread for the reader.  Conversely, *The Maze Runner* falls within the dystopian fantasy/science fiction genre—a futuristic universe where oppression is frequently enacted by a totalitarian or authoritarian government or corporation.  The Court, hence, finds there are no similarities in the mood of the two works.

### (4) Setting

Plaintiffs claim that the settings in both works are identical:  a maze.  As noted above, the concept of a maze is not a protectable element.  Nonetheless, a closer look at the competing mazes demonstrates that the mazes have no factual similarities.  For example, in *The Maze*, the maze is contained within an office building in New York.  Although Plaintiffs describe the maze as "giant," there is no textual support in the novel for this assertion.  In addition, the maze's

walls and staircases shift and change in composition as the contestants travel through the maze. And, each room presents a formidable element that, generally, results in the death of a contestant.

*The Maze Runner*, on the other hand, is set outside in an area called the Glade. The Glade is expanse acreage which contains sleeping quarters, a forest, and a farming section. The Glade is encased by four concrete walls covered in ivy that separate the Glade from the maze. Each wall is over a hundred feet tall and has a sliding door in its center that opens every morning and closes every night. The maze consists of giant labyrinths divided into eight sections. Every night the walls change, repeating the same pattern every month. The pattern is a code that consists of a sequence repeated every eight months.

In light of these above differences, the Court finds that no reasonable person could determine that the settings depicted in *The Maze* and *The Maze Runner* are substantially similar.

### (5) Pace

Likewise, the pace of the two works is not substantially similar. In *The Maze*, the book is slow to start—explaining and building on the dynamic between Jay, Ramon, and Ray. Once they arrive at the Maze, the three protagonists are placed in very fast-paced situations within the maze. And, the events unfold over mere hours. In *The Maze Runner*, however, the pace shifts between slow and fast over the course of several days. For example, the movie is fast-paced when the Thomas attempts to outmaneuver a Griever when trapped in the maze overnight and when the Grievers attack the Glade. Nevertheless, the pace slows when Thomas and Teresa reflect on their roles in the creation of the Glade or when Chuck tells Thomas about his dream to one day find his parents. Hence, while the works intertwine slow and fast pace, the manner in

which they present those paces differs greatly.  Thus, it follows that no reasonable person could

find that the pace of the books is substantially similar.

*(6) Characters*[8]

Plaintiffs claim there are substantial similarities between four of the five major characters

in the two works.  Particularly, Plaintiffs assert Kevin from *The Maze* and Alby from *The Maze*

*Runner* are substantially similar because they are both "Black leader[s]."  (Doc. 36) at 8 (citing

(Doc. 5) at 18–21); (Doc. 38) at 19.  In *The Maze,* Kevin is never unequivocally or casually

identified as the leader of the contestants.  Whereas in *The Maze Runner*, Alby is the elected

leader because he was the first to arrive at the Glade.

Plaintiffs also assert that Rob from *The Maze* is similar to an unidentified boy in *The*

*Maze Runner* because they both have "square jaw[s]."  (Doc. 36) at 8.  Plaintiffs further maintain

that the "heavily muscled Asian kid" in *The Maze Runner* is similar to Ramon from *The Maze.*

*Id.*  Finally, Plaintiffs contend Winston, "an acne-covered kid" and an unidentified "short, pudgy

boy" from *The Maze Runner* resemble Jay in *The Maze.*  None of these comparisons have merit;

"[c]opyright law provides very limited protection to the characters presented in the creative

work."  *Acker*, 46 F. Supp. 3d at 172 (internal quotation and citation omitted).  A character's

obscure or general appearance is not a protectable expression.  *See Nichols v. Universal Pictures*

*Corp.*, 45 F. 2d 119, 121 (2d Cir. 1930), *cert denied*, 282 U.S. 902 (1931).  Only well-developed

characters may enjoy copyright protection.  *Id.* ("It follows that the less developed the characters,

the less they can be copyrighted; that is the penalty an author must bear for marking them too

indistinctly.").  Therefore, Plaintiffs' asserted basic characteristics are insufficient to support a

finding of substantial similarity.

---

[8]  Notably, Plaintiffs specifically raise this argument in their response regarding the comparison of the two literary works, not the film.  *See* (Doc. 36) at 8.  Plaintiffs' response to the current motion, however, incorporates the character similarities argument from (Doc. 36).  As such, the Court will address Plaintiffs' contentions.

In light of the aforementioned, the Court finds that no reasonable person would conclude that *The Maze* and *The Maze Runner* are substantially similar.  As a result, Plaintiffs' Complaint lacks any allegations, beyond Plaintiffs' conclusory statement, that Defendant Fox's work, *The Maze Runner* film, infringed on Plaintiffs' protectable expressions in *The Maze*.  Thus, Plaintiffs' Count I and Count IV are subject to dismissal under Rule 12(b)(6).  It also follows that Plaintiffs' Count II is dismissed as the substantive claim no longer remains to support a claim for injunctive relief.  Hence, those claims will be dismissed with prejudice.

### C.  *Unfair Trade Practices & Unfair Competition (Count III)*[9]

Defendant Fox asserts that Plaintiffs' state law unfair trade practices and unfair competition claims are preempted by the Copyright Act, 17 U.S.C. §§ 101–1332.  Furthermore, Plaintiffs' federal unfair competition claim for attribution falls within the exclusive province of federal copyright law.  Plaintiffs counter that under New Mexico's notice only pleadings standard, the Complaint sufficiently pleads the unfair trade practices and unfair competition claims.

### 1.  *Plaintiffs' State Law Claims*

Section 301 of the Copyright Act describes the extent to which state common-law and statutory causes of action are preempted.  It provides, in relevant part:

> (a) [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or

---

[9] Count III of Plaintiffs' Complaint fails to factually allege that Defendant Fox violated unfair trade practice or unfair competition laws.  *See* (Doc. 1) at 11–12.  Count III only addresses Defendant James Dashner and Defendant Random House.  Consequently, the Court finds that Plaintiffs have failed to state a claim for unfair trade practice and unfair competition against Defendant Fox.  And, as such, Plaintiffs' claim in Count III will be dismissed.  The Court, nonetheless, will conduct an analysis to determine whether Plaintiffs' Count III should be dismissed with prejudice because the claim is futile.

equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to
. . .

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301.  "[A] state-law claim is preempted if (1) the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1146 (10th Cir. 2009) (internal quotation and citation omitted).  Section 301 also "bars state law . . . claims with respect to uncopyrightable as well as copyrightable elements."  *Id.* at 1146-47.

Defendant Fox maintains that Plaintiffs' claim meets both prongs of the preemption test: *The Maze* is a literary work under 17 U.S.C. § 102(a)(1); and, Plaintiffs have not alleged a requisite extra element to distinguish the purported rights at issue from those conferred by copyright.  Plaintiffs do not challenge either of Defendant Fox's contentions.  And, as such, the Court finds that the first requirement is satisfied.  The Court, nevertheless, will review "whether the state-law rights asserted by [Plaintiffs] are equivalent to any of the exclusive rights within the general scope of copyright, as specified in 17 U.S.C. § 106."  *Id.* at 1147.

Section 106 of the Copyright Act grants copyright owners the exclusive rights to:  (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work to the public by sale; (4) perform the work publicly; and (5) display the work publicly.  17 U.S.C. § 106(1)–(6).  As explained by the Tenth Circuit, a state violation is deemed preempted, "[w]hen a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights."  *R.W. Beck, Inc.*, 577 F.3d at 1147 (internal quotations

omitted).  The state law is not preempted if the state law violation is "predicated upon an act

incorporating elements beyond mere reproduction or the like."  *Id.*

In Count III of the Complaint, Plaintiffs allege that:

*The Maze* by Tize Clark was in the public domain and was receiving healthy book
sales and royalties to Tize Clark, in the summer of 2005. . . . [Defendant] Dashner
published his novel . . . without consent or acknowledgment of its source and
copyrightable material from 2009 to 2013 with million dollar sales of his book.
From at least October 6 of 2009, and continuously since that date [D]efendant
James Dashner and Random House (Delacorte Press) [sic] has been publishing,
selling, and otherwise marketing the book, *The Maze Runner* by Dashner, to their
profit and without credit and royalties to Tize Clark.

(Doc. 1) at 12 ¶¶ 43–47.  It is evident from the Complaint that Plaintiffs assert damages arising

out of Defendant James Dashner's and Defendant Random House's publication and selling of

*The Maze Runner* as their own original work.  Plaintiffs also—for the first time in their

response—assert that Defendant Fox, "as the creator of the Movie version with no crediting or

licensing, or payment of royalties under an implied contract" unlawfully appropriated Plaintiff

Clark's work.[10]  (Doc. 38) at 26.  Because the nature of Plaintiffs' state law unfair trade practices

and unfair competition claim flows from the "publication" of *The Maze Runner* that arose from

the alleged copying of Plaintiffs' work, Plaintiffs' state law claim is preempted.  *See R.W. Beck,*

*Inc.*, 577 F.3d at 1145–49 (state law claims of unfair competition and unjust enrichment

preempted by Copyright Act); *see also Ehat v. Tanner*, 780 F.2d 876, 879 (10th Cir. 1985)

(nature of unfair competition claims based on "reproduction" of plaintiff's work are within scope

---

[10]  By raising this factual allegation at this stage in litigation, Plaintiffs are, in effect, attempting to amend the
Complaint to include specific allegations pertaining to Defendant Fox and Count III.  The Court, however, will not
consider allegations which do not appear in the Complaint.  *See Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995)
("It is well established . . . that in determining whether to grant a motion to dismiss, the district court . . . [is] limited
to assessing the legal sufficiency of the allegations contained within the four corners of the complaint."), *see also*
*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054 (1985) ("[I]t
is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").  The Court
will, therefore, strike Plaintiffs' new factual contention.

of federal copyright).  Accordingly, Plaintiffs' state law claim in Count III is subject to dismissal for failure to state a claim with prejudice.

2. *Plaintiffs' Federal Unfair Competition Claim*

Defendant Fox contends that Plaintiffs' federal unfair competition claim is subject to dismissal because Plaintiffs' rights are limited to those provided by the Copyright Act, and, therefore, Plaintiffs cannot also pursue a Section 43(a) Lanham Act claim.  Defendant Fox cites *Dastar v. Twentieth Century Fox*, 539 U.S. 23 (2003), to argue the Section 43(a) claim is barred as a matter of law.  Plaintiffs did not directly respond to Defendant Fox's assertion.

The Lanham Act, generally, "was intended to make 'actionable the deception and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'"  *Dastar*, 539 U.S. at 28 (ellipsis in original) (quoting 15 U.S.C. § 1127).  Section 43(a) of the Lanham Act provides, in pertinent part:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—
>
> (A) Is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .
> . . .
>
> [S]hall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

Here, in the Complaint, Plaintiffs allege Defendant Dashner and Defendant Random House published, sold, and marketed the book *The Maze Runner* as their own.  This constitutes a claim of "reverse passing off," where Defendants "misrepresent[] someone else's goods or

services as [their] own." *Dastar*, 539 U.S. at 27 n.1 (citation omitted).   The Court agrees *Dastar* governs its evaluation of this claim.

      In *Dastar*, the defendant purchased videos of a television series for which the copyright had expired, copied the videos, made some "minor" revisions, and then released the videos under a new title that referenced the defendant as the distributor and producer.  *Id.* at 26–27, 31.  The Supreme Court rejected the plaintiffs' reverse passing off claim under the Lanham Act for failure to credit the plaintiffs for the original videos.  The Supreme Court held that the term "origin" as used in Section 43(a)(1) is "incapable of connoting the person or entity that originated the ideas or communications" contained in the produced goods.  *Id.* at 32.  In declining to recognize a cause of action under Section 43(a) "for, in effect, plagiarism," the Supreme Court found that such a holding would conflict with federal copyright law, "which addresses that subject specifically."  *Id.* at 33, 36.  The Court concluded:

> In sum, reading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality or creativity), and in the light of the copyright and patent laws (which *were*), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

*Id.* at 37 (emphasis in original).

      It follows that under *Dastar*, the Lanham Act does not prohibit the conduct complained of in this matter, *i.e.* Defendants publication of *The Maze Runner*, which Plaintiffs allege is substantially similar to Plaintiffs' work, without crediting Plaintiffs.  This type of allegation falls within the exclusive purview of federal copyright law.  Thus, Plaintiffs may not state a federal unfair competition claim for the same alleged conduct that supports the copyright infringement claim.  Consequently, Defendant Fox is entitled to dismissal, with prejudice, of Plaintiffs' federal unfair competition claim in Count III.

IT IS, THEREFORE, ORDERED that

1.  Motion to Dismiss by Defendant Twentieth Century Fox Film Corporation (Doc. 24) is granted; and

2.  Plaintiffs' claims against Defendant Twentieth Century Fox Film Corporation in Count I, Count II, Count III, and Count IV in the Complaint (Doc. 1), filed October 24, 2014, will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE